# ILLINOIS OFFICIAL REPORTS

## Supreme Court

---

### *People v. Radojcic*, 2013 IL 114197

---

| | |
|---|---|
| Caption in Supreme Court: | THE PEOPLE OF THE STATE OF ILLINOIS, Appellee, v. BUDIMIR RADOJCIC *et al.*, Appellants. |
| Docket Nos. | 114197, 114214 cons. |
| Filed | November 21, 2013 |
| Held<br><br>(*Note: This syllabus constitutes no part of the opinion of the court but has been prepared by the Reporter of Decisions for the convenience of the reader.*) | The attorney-client privilege will give way if a client seeks legal assistance for illegal ends, and the State met its evidentiary burden of establishing this crime-fraud exception where transcripts of grand jury testimony provided a reasonable basis to suspect that a defendant's communications with his lawyer, even through a third person, were in furtherance of the mortgage-fraud scheme charged—no need for *in camera* review. |
| Decision Under Review | Appeals from the Appellate Court for the First District; heard in that court on appeal from the Circuit Court of Cook County, the Hon. Thomas Joseph Hennelly, Judge, presiding. |
| Judgment | Affirmed. |

Counsel on
Appeal

Michael J. Pelletier, State Appellate Defender, Alan D. Goldberg, Deputy Defender, and Michael G. Soukup and Emily S. Wood, Assistant Appellate Defenders, of the Office of the State Appellate Defender, of Chicago, for appellant Budimir Radojcic.

Leonard C. Goodman, Melissa A. Matuzak and Jaqueline Shiff, of Chicago, and Amanda Graham and Kathryn Kizer, law students, for appellant Mark Helfand.

Lisa Madigan, Attorney General, of Springfield, and Anita Alvarez, State's Attorney, of Chicago (Michael A. Scodro, Solicitor General, and Michael M. Glick, David A. Simpson and Matthew P. Becker, Assistant Attorneys General, of Chicago, of counsel), for the People.

Justices

JUSTICE THEIS delivered the judgment of the court, with opinion.

Chief Justice Garman and Justices Freeman, Thomas, Kilbride, Karmeier, and Burke concurred in the judgment and opinion.

**OPINION**

¶ 1      At issue in this appeal is whether, pursuant to the crime-fraud exception to the attorney-client privilege, attorney Mark Helfand may testify regarding communications with Budimir Radojcic, a former client, at Radojcic's criminal trial. The circuit court of Cook County concluded that the State failed to meet its evidentiary burden for application of the exception, and struck Helfand's name from the State's witness list. The appellate court reversed, holding that the crime-fraud exception applied. 2012 IL App (1st) 102698.

¶ 2      For the reasons that follow, we affirm the judgment of the appellate court.

¶ 3                      BACKGROUND

¶ 4      On December 5, 2007, a Cook County grand jury entered a 52-count indictment against Radojcic, Helfand, and three others: Suzana Radojcic and Mirjana Omickus (Radojcic's daughters), and Christa Patterson. The indictment charged defendants with the following crimes: continuing financial crimes enterprise (720 ILCS 5/16H-50 (West 2008)); conspiracy to commit a financial crime (720 ILCS 5/16H-45 (West 2008)); financial institution fraud (720 ILCS 5/16H-25 (West 2008)); theft (720 ILCS 5/16-1 (West 2008)); money laundering (720 ILCS 5/29B-1 (West 2008)); forgery (720 ILCS 5/17-3 (West 2008)); wire fraud (720 ILCS 5/17-24(a) (West 2008)); and mail fraud (720 ILCS 5/17-24(b) (West 2008)). The indictment also charged Radojcic individually with being an organizer of a continuing

financial crimes enterprise. 720 ILCS 5/16H-55 (West 2008).

¶ 5 Generally, the State alleged that, beginning in August 2004, defendants participated in a scheme, orchestrated by Radojcic, under which properties owned or otherwise controlled by him, which he had allegedly converted to condominiums, were sold to straw buyers who then conveyed the properties back to Radojcic. To purchase the properties, the straw buyers allegedly obtained mortgage loans through fraudulent means.

¶ 6 The indictment focused on 10 such mortgages and two straw buyers. Specifically, the State alleged that Suzana Radojcic and Mirjana Omickus recruited Danijela Kuljanin and Biljana Aranyos to purchase certain properties for Radojcic's benefit. Aranyos purchased four condominium units at 5516 South Prairie Avenue in Chicago, and three condominium units at 3338 South Calumet Avenue in Chicago. Kuljanin purchased three condominium units at 6507 South Langley Avenue in Chicago. Suzana Radojcic paid Kuljanin at least $2,000 to purchase the three units for Radojcic, and Radojcic told Aranyos and Kuljanin that he would make the mortgage payments for them. According to the indictment, the lenders defrauded in these transactions included Wells Fargo Bank, Franklin American Mortgage Company, Credit Suisse Financial Corporation, Countrywide Mortgage Corporation, Mortgage Lender USA, Inc., Argent Mortgage Company, Taylor Bean & Whitaker Mortgage Company, BNC Mortgage, Inc., and Long Beach Mortgage Company.

¶ 7 Suzana Radojcic and Omickus prepared the mortgage loan applications for the 10 properties at issue. Those applications, the State alleged, were materially false in that they overstated the applicant's income, overstated the amount of money the applicant had on deposit, and/or overstated the amount of the applicant's earnest money deposit. At least with respect to the purchases involving Aranyos, Omickus allegedly facilitated the temporary deposit of funds into Aranyos' personal account to create the impression that Aranyos had the appropriate funds on hand. Omickus and Suzana Radojcic also submitted to the lenders "gift letters" falsely reporting that Aranyos and Kuljanin had received gifts of money, which had been deposited into their respective accounts.

¶ 8 Christa Patterson, the office manager for Jewel Windows, which also employed Aranyos, coordinated the real estate closings, provided verification of employment for certain buyers, signed real estate sales contracts for certain properties, and arranged for appraisals that used other properties Radojcic owned as comparable properties. Patterson also communicated with Helfand who, as part of the scheme, set up a land trust under which Patterson held the power of direction.

¶ 9 The State further alleged that Radojcic took the proceeds from the condominium sales, which were received at closing in the form of checks from the title company, to the Belmont and Cicero Currency Exchange. There, Radojcic obtained several money orders in various amounts, with the name of the payee and remitter in blank, to conceal his involvement.

¶ 10 In addition to communicating with Jewel Windows and setting up a land trust, the State alleged that Helfand caused condominium declarations and bylaws to be created and filed to support the mortgage applications. Helfand further caused deeds to be signed and recorded in which Radojcic, through others, retained control of the properties. In particular, Helfand prepared deeds for the three condominium units Kuljanin purchased, and instructed her to

execute the deeds, which she did, so that the units could be transferred back to Radojcic.

¶ 11    Finally, the State alleged that Radojcic, through an entity known as B&B Properties II, LLC, fraudulently obtained rental checks exceeding $500,000 from the United States Department of Housing and Urban Development.

¶ 12    In November 2009, following discovery, the State indicated its intent to call Helfand as a witness during its case in chief, in exchange for "use immunity." See 725 ILCS 5/106-2.5(b) (West 2008). Both Helfand and Radojcic filed written objections, arguing that such testimony would violate the attorney-client privilege. According to Helfand's pleading, in which Radojcic joined, between late 2002 and 2008, Helfand was hired to perform legal work for Radojcic, Patterson, "and their affiliated companies." Helfand, who described himself as a "real estate and corporate attorney," stated that the "real estate work for Radojcic consisted primarily of representing Bozena Radojcic [Radojcic's wife] and the affiliated companies of Radojcic in the buying and selling of real estate, converting apartment buildings into condominiums, and appearing in court to clear up building [code] violations."

¶ 13    The State maintained that Helfand's testimony regarding the work he performed in connection with the real estate transactions identified in the indictment would not require disclosure of confidential communications and, therefore, would not implicate the attorney-client privilege. The State further maintained that, to the extent Helfand's testimony would reveal confidential communications, his testimony should be allowed pursuant to the crime-fraud exception to the attorney-client privilege. In support of its argument that the crime-fraud exception applied, the State relied on the grand jury testimony of Patterson and Aranyos, as well as the grand jury testimony of Thomas Hoffman, an agent for the Department of Housing and Urban Development, upon which the indictment in this case was returned.[1]

¶ 14    Aranyos testified that she worked for Jewel Windows from February 2005 through September 2006, primarily in the company's construction and home improvement sector. She was paid $500 per week in cash. Aranyos understood that Radojcic, who hired her, was the owner. Aranyos, however, reported to Patterson, the office manager. Radojcic was in the office for only brief periods of time, typically meeting with Patterson behind closed doors.

¶ 15    According to Aranyos, Radojcic's three daughters—Mirjana, Suzana, and Zorika—all worked in the mortgage industry. In early 2006, Mirjana approached Aranyos about buying a condominium in a three-unit building at 3338 South Calumet Avenue in Chicago. Aranyos understood that Radojcic would be the actual owner and, pursuant to a written agreement, Radojcic would make the payments on the mortgage Aranyos obtained. Aranyos agreed to obtain a mortgage for that property, as well as the other two condominiums in the three-unit Calumet Avenue building. In addition, she obtained mortgages in her name on all four

---

[1]Although Radojcic and Helfand maintain that a transcript of Hoffman's grand jury testimony was not before the trial court, we have carefully reviewed the record and conclude otherwise. We note that the initial page of the transcripts bears the stamp of the circuit court, evincing a filing date of March 5, 2010. That date coincides with the filing date of the State's response to Radojcic's and Helfand's objection to Helfand testifying.

condominiums in a four-unit building at 5116 South Prairie Avenue in Chicago.[2] In exchange for her participation in the condominium purchases, Aranyos received $40,000 in cash. Aranyos understood that each condominium she purchased was in some way "operated" by Radojcic or B&B Properties, a Radojcic company that bought and sold real estate. Aranyos became aware that the condominium units were later rented and that B&B Properties was the landlord.

¶ 16    Aranyos further testified that she did not understand the mortgage process and simply signed the mortgage applications and related documents that Mirjana and Patterson prepared. Some of the mortgage documents misstated the length of her employment at Jewel Windows or overstated her income. In addition, the earnest money required for the purchases was supplied by Patterson. Aranyos explained that cash, totaling as much as $65,000, was temporarily deposited into her account and withdrawn after closing. At least in one instance, the funds were returned to B&B Properties. Aranyos also testified regarding a "gift letter" submitted to a lender which falsely indicated a gift of $65,000 had been made to her by her uncle, Marvin Freeman. No gift was made, and Freeman was not her uncle; he was the owner of the Belmont and Cicero Currency Exchange, with whom Jewel Windows did considerable business.

¶ 17    Aranyos testified that following two of the closings, she signed quitclaim deeds transferring the properties back to Radojcic or Jewel Windows. She recalled that Helfand attended at least two closings, representing Radojcic or B&B Properties.

¶ 18    Patterson testified that she worked for Radojcic for 15 years. Although she is listed with the Secretary of State's office as the sole proprietor of Jewel Windows, Patterson testified that Radojcic owns and operates the company. Patterson identified other companies, including B&B Properties, B&R Investments, Fields Windows and Doors, and Fields Interior and Exterior Corporation, that are owned and operated by Radojcic, even though, on paper, Patterson or Radojcic family members are identified as the owners. Patterson testified that Radojcic would purchase multiunit buildings, convert the buildings to condominiums, and sell the condominiums to straw buyers. The buyers would transfer the property back to one of Radojcic's companies, after which Radojcic would rent the units. Radojcic's name, however, would not appear on any of the documentation.

¶ 19    While employed at Jewel Windows, Patterson was involved in obtaining straw buyers and facilitating the mortgage application process. She confirmed that the mortgage applications contained false information, and that funds, belonging to Radojcic, were temporarily deposited into a buyer's account until the mortgage was obtained. Funds were obtained through the Belmont and Cicero Currency Exchange, which Radojcic and Jewel Windows used as a bank. Radojcic maintained no bank accounts. Patterson also worked with certain appraisers, telling them what value needed to be set for a property, and identifying which Radojcic properties could be used as "comps."

¶ 20    Patterson testified that she communicated with Helfand, who prepared the condominium

---

[2]The record is unclear as to whether the Prairie Avenue condominiums that Aranyos purchased were located at 5116 or 5516 South Prairie Avenue.

conversion documents and two deeds for each property. One deed, which was included in the closing packet, conveyed the property from a Radojcic company to the straw buyer. A second deed, which Helfand would have recorded a week or two after the closing, conveyed the property back to the same or a different Radojcic company. Patterson provided directions to Helfand identifying the company to which Radojcic wanted the property conveyed and how the funds should be distributed. Patterson explained:

> "We sold condos straight out and we used straw buyers to take the mortgages out. So if we sold a condo straight out, if the condo was worth 250, Bud [Radojcic] would only want 200. So the direction given to Mark [Helfand] is, Bud only gets $200,000. The change goes to the buyer."

The "change" was payment to the straw buyer for permitting his or her name to be used in the transaction.

¶ 21    With respect to the Langley Avenue building, Patterson testified that the mortgage applications for the three units Kuljanin purchased were provided to three different lenders simultaneously, so that the applications could be processed simultaneously and, as a result, close within a day or two of each other. In this way, the lenders would not be aware that Kuljanin was buying three units. The loans for the three Langley Avenue units were obtained through Bell Capital, for whom Kuljanin, Radojcic's three daughters, and Radojcic's former wife, Mira Kostic, worked.

¶ 22    With respect to the Calumet Avenue building, Patterson testified that the property was originally purchased in the name of Radojcic's wife. The property was then transferred to B&B Properties, which, in turn, sold the three units to Aranyos. Helfand attended all three closings. According to Patterson, she sometimes instructed Aranyos to convey directions to Helfand, and that he was thus aware that Aranyos worked at Jewel Windows.

¶ 23    Finally, Patterson testified that she maintained a list of all of Radojcic's properties, indicating how title was held. The condominium units were used as rental property, 90% of which were occupied by "section 8" tenants.[3] The Department of Housing and Urban Development issued rent checks for such tenants to B&B Properties, which in turn were conveyed to Radojcic. Patterson explained that Radojcic's name did not appear on any of the Department's documents because Radojcic was $2 million in debt to the Internal Revenue Service.

¶ 24    Hoffman, an agent for the Department of Housing and Urban Development, testified that he participated in an investigation of Radojcic in cooperation with the United States Secret Service and postal inspection agents. The investigation disclosed that Radojcic, Helfand, Patterson, Omickus, and Suzana Radojcic were involved in a mortgage fraud scheme. Hoffman's testimony concerning the overall scheme, including the false mortgage applications, the straw buyers, the transfer of the properties back to a Radojcic company, use of the properties as section 8 housing, and Helfand's involvement in the real estate closings, tracked Patterson's testimony. Hoffman also testified, like Patterson, that Radojcic's name

---

[3]This is an apparent reference to section 8 of the United States Housing Act of 1937, providing federally funded low-income housing assistance. See 42 U.S.C. § 1437f.

did not appear on any of the documents.

¶ 25    Hoffman further testified that shortly after the closings on the three Langley Avenue units that Kuljanin purchased, Kuljanin deeded all three units to a land trust, in which Patterson held the power of direction. Helfand was involved in this transaction and notarized Kuljanin's signature on the deed transferring the properties to the trust. According to Hoffman, the three lenders involved in the initial purchase were not notified of the transfer.

¶ 26    Finally, Hoffman testified that during 2005, 2006, and a portion of 2007, the Department of Housing and Urban Development paid B&B Properties, for section 8 housing, approximately $700,000. Had the Department been aware of the underlying fraud, those funds would not have been paid.

¶ 27    After considering the foregoing transcripts and the parties' arguments, the trial court ruled that the State had not met its evidentiary burden for application of the crime-fraud exception, and struck Helfand's name from the State's witness list. The State subsequently filed a certificate of substantial impairment and notice of appeal.

¶ 28    The appellate court, applying *de novo* review, reversed and remanded for a trial at which the State may call Helfand as a witness. 2012 IL App (1st) 102698, ¶¶ 2, 12. Relying on the standard set forth in *In re Marriage of Decker*, 153 Ill. 2d 298 (1992), the appellate court found that the grand jury testimony presented by the State "would give a reasonable person cause to suspect that the client here used his communications with his attorney to advance his attempts to commit crimes or fraud." *Id.* ¶ 2.

¶ 29    We allowed the petitions for leave to appeal filed by Radojcic and Helfand (Ill. S. Ct. R. 315 (eff. Feb. 26, 2010)), and consolidated the cases for review.


¶ 30                              ANALYSIS
¶ 31                                  I
¶ 32    At issue is whether the State made the requisite evidentiary showing for application of the crime-fraud exception. The parties disagree as to the appropriate standard of review. Radojcic argues that the trial court's ruling should be reviewed for an abuse of discretion. Although Helfand advocates a bifurcated standard of review, he, too, argues that the trial court's ruling as to the admissibility of his testimony should be reviewed for an abuse of discretion. The State, echoing the appellate court, urges *de novo* review. We agree with the State.

¶ 33    The standard of review identifies the degree of deference a reviewing court will give to the decision below. See *In re D.T.*, 212 Ill. 2d 347, 355 (2004); *AFM Messenger Service, Inc. v. Department of Employment Security*, 198 Ill. 2d 380, 390 (2001); Timothy J. Storm, *The Standard of Review Does Matter: Evidence of Judicial Self-Restraint in the Illinois Appellate Court*, 34 S. Ill. U. L.J. 73 (2009). The most deferential standard of review is abuse of discretion, which is "traditionally reserved for decisions made by a trial judge in overseeing his or her courtroom or in maintaining the progress of a trial." *D.T.*, 212 Ill. 2d at 356. Radojcic argues that this deferential standard applies here because the trial court was required to make factual findings in order to determine whether the crime-fraud exception

applies.

¶ 34   Although a trial court's factual findings are accorded deference on review and will only be reversed if they are against the manifest weight of the evidence, that deference "is grounded in the reality that the circuit court is in a superior position to determine and weigh the credibility of the witnesses, observe the witnesses' demeanor, and resolve conflicts in their testimony." *People v. Richardson*, 234 Ill. 2d 233, 251 (2009). Here, however, the State offered no live testimony, only transcripts from the grand jury proceedings. Thus, the trial court did not occupy a position superior to the appellate court or this court in evaluating the evidence offered by the State in support of the crime-fraud exception. See *Addison Insurance Co. v. Fay*, 232 Ill. 2d 446, 453 (2009).

¶ 35   Furthermore, the only "finding" the trial court made was that the State had failed to make the evidentiary showing required for application of the exception. That determination was not a factual one, but rather a legal one, not unlike a trial court's ultimate ruling on a suppression motion. Such legal determinations are reviewed *de novo*. See *Richardson*, 234 Ill. 2d at 251 ("a court reviews *de novo* the ultimate legal question posed by the challenge to the circuit court's ruling on the suppression motion"). We note that in a case similar to the one at bar, where we were called upon to review deposition testimony to determine whether a party had waived the attorney-client privilege, we applied *de novo* review. *Center Partners, Ltd. v. Growth Head GP, LLC*, 2012 IL 113107, ¶ 65 (citing *Norskog v. Pfiel*, 197 Ill. 2d 60, 71 (2001)). Radojcic and Helfand offer no reasoned basis for applying a different standard here.

¶ 36   We recognize, as Radojcic notes, that federal courts of appeal have reviewed district court decisions regarding the crime-fraud exception for an abuse of discretion. See, *e.g.*, *United States v. BDO Seidman, LLP*, 492 F.3d 806, 818 (7th Cir. 2007); *In re Feldberg*, 862 F.2d 622, 626 (7th Cir. 1988). We are not bound by these decisions (*Sundance Homes, Inc. v. County of Du Page*, 195 Ill. 2d 257, 276 (2001)), and decline to adopt the federal standard of review as our own. We will follow Illinois precedent and apply *de novo* review.

¶ 37                                              II

¶ 38   Preliminary to our consideration of the parties' arguments, we consider the nature of the attorney-client privilege and the crime-fraud exception.

¶ 39   The attorney-client privilege is the oldest of the privileges for confidential communications known to the common law. 8 John H. Wigmore, Evidence § 2290, at 542 (McNaughton rev. ed. 1961). The purpose of the privilege, which belongs to the client (*Decker*, 153 Ill. 2d at 313), is to encourage and promote full and frank communication between the client and his or her attorney, without the fear that confidential information will be disseminated to others. *People v. Simms*, 192 Ill. 2d 348, 381 (2000); *Consolidation Coal Co. v. Bucyrus-Erie Co.*, 89 Ill. 2d 103, 117-18 (1982). The privilege embodies the principle that sound legal advice and advocacy are dependent upon such full and frank communication. *Upjohn Co. v. United States*, 449 U.S. 383, 389 (1981).

¶ 40   This court has recognized the following essential elements for the creation and application of the attorney-client privilege:

" '(1) Where legal advice of any kind is sought (2) from a professional legal adviser in his capacity as such, (3) the communications relating to that purpose, (4) made in confidence (5) by the client, (6) are at his instance permanently protected (7) from disclosure by himself or by the legal adviser, (8) except the protection be waived.' " *People v. Adam*, 51 Ill. 2d 46, 48 (1972) (quoting 8 John H. Wigmore, Evidence § 2292, at 554 (McNaughton rev. ed. 1961)).

Accord *Simms*, 192 Ill. 2d at 381. Although this formulation of the privilege suggests that only communications "by the client" are protected from disclosure, the modern view is that the privilege is a two-way street, protecting both the client's communications to the attorney and the attorney's advice to the client. Edward J. Imwinkelried, The New Wigmore: A Treatise on Evidence § 6.6.1, at 585 (2002). See also *Midwesco-Paschen Joint Venture for the Viking Projects v. Imo Industries, Inc.*, 265 Ill. App. 3d 654, 660-61 (1994) (rejecting the argument that only communications from a client to an attorney are covered by the attorney-client privilege); *In re Marriage of Granger*, 197 Ill. App. 3d 363, 374 (1990) (observing that the attorney-client privilege applies "not only to the communications of a client to his attorney, but also to the advice of an attorney to his client").

¶ 41       The attorney-client privilege, like all testimonial privileges, is inherently "inconsistent with the search for truth" because it "prevent[s] otherwise relevant and admissible evidence from being disclosed." *People v. Knuckles*, 165 Ill. 2d 125, 135 (1995). Thus, the attorney-client privilege constitutes a departure from the general duty to disclose and, accordingly, must be "strictly confined within its narrowest possible limits." *Waste Management, Inc. v. International Surplus Lines Insurance Co.*, 144 Ill. 2d 178, 190 (1991). The crime-fraud exception, relevant here, is one of the recognized limits to the attorney-client privilege. The exception is triggered "when a client seeks or obtains the services of an attorney in furtherance of criminal or fraudulent activity." *Decker*, 153 Ill. 2d at 313. "[W]here the crime-fraud exception applies, no attorney-client privilege exists whatsoever." *Id.*

¶ 42       The rationale underlying the crime-fraud exception is intimately connected to the nature of the attorney-client relationship. As we explained in *Decker*, "in seeking legal counsel to further a crime or fraud, the client does not seek advice from an attorney in his professional capacity." *Id.* The client either conspires with the attorney or deceives the attorney. In the former case, the privilege will not apply because it cannot be the attorney's business to further any criminal object. In the latter case, the privilege does not apply because the attorney's advice has been obtained by a fraud. *Id.* In other words, the attorney-client privilege "takes flight if the relation is abused." *Clark v. United States*, 289 U.S. 1, 15 (1933).

¶ 43       A client, of course, may consult with his or her attorney about the legal implications of a proposed course of conduct, or how to defend against the legal consequences of past conduct, without triggering the crime-fraud exception. Such good-faith consultations are protected by the attorney-client privilege. *Decker*, 153 Ill. 2d at 314; 8 John H. Wigmore, Evidence § 2298, at 573 (McNaughton rev. ed. 1961). The privilege does not extend, however, to a client who seeks or obtains the services of an attorney to further an "ongoing or future crime or fraud." Edward J. Imwinkelried, The New Wigmore: A Treatise on Evidence § 6.13.2, at 976 (2002). Such a client "will have no help from the law." *Clark*, 289

U.S. at 15. See also Edna Selan Epstein, *The Attorney-Client Privilege and the Work-Product Doctrine*, in Section of Litigation, American Bar Association 253 (3d ed. 1997) ("All the policy reasons that support the existence of the [attorney-client] privilege are said to cease as soon as the line is crossed from advice on conforming one's actions to the mandate of the law or defending against the consequences of past actions into the domain of contemplated or actual illegal action.").

¶ 44    Disclosure of otherwise privileged attorney-client communications under the crime-fraud exception cannot be based solely on a charge of illegality unsupported by any evidence. *Decker*, 153 Ill. 2d at 321. Rather, "[t]o drive the privilege away, there must be something to give colour to the charge." (Internal quotation marks omitted.) *Id.* (quoting *Clark*, 289 U.S. at 15). Specifically, the proponent of the crime-fraud exception must present evidence from which a " 'prudent person' " would have a " 'reasonable basis to suspect' " (1) " 'the perpetration or attempted perpetration of a crime or fraud, and' " (2) " 'that the communications were in furtherance thereof.' " *Decker*, 153 Ill. 2d at 322 (quoting *In re Grand Jury Subpoena Duces Tecum Dated September 15, 1983*, 731 F.2d 1032, 1039 (2d Cir. 1984)).[4] The difficulty of making this evidentiary showing lies in the fact that the best and often only evidence of whether the exception applies is the allegedly privileged communication itself. *Id.* "However, if the communication itself is used to make the initial determination of whether the crime-fraud exception applies, the privilege is violated and the protected interest suffers because of the forced public revelation." *Id.*

¶ 45    In *Decker*, this court addressed this evidentiary dilemma and adopted the approach set forth in *United States v. Zolin*, 491 U.S. 554 (1989). *Id.* at 323-25. Under this approach, the trial court may conduct *in camera* review of the communications at issue to determine whether the crime-fraud exception applies. Before such review may be undertaken, however, the proponent of the crime-fraud exception must make " ' "a showing of factual basis adequate to support a good faith belief by a reasonable person," [citation] that *in camera* review of the materials may reveal evidence to establish the claim that the crime-fraud exception applies.' " *Id.* at 324 (quoting *Zolin*, 491 U.S. at 572). This evidentiary showing is lesser than the showing ultimately needed to establish application of the crime-fraud exception. *Id.* Ideally, *in camera* review should be conducted by a judge other than the judge presiding over the matter at which the communications would be introduced. *Id.* at 325. *In camera* questioning of the attorney must be narrowly tailored so that confidential information is not needlessly disclosed. *Id.*

¶ 46    Overall, the approach adopted in *Decker* for *in camera* review balances the interests protected by the attorney-client privilege with this state's "strong policy of encouraging disclosure, with an eye toward ascertaining that truth which is essential to the proper disposition of a lawsuit." *Waste Management*, 144 Ill. 2d at 190.

¶ 47    With this background, we consider the parties' arguments.

---

[4]This evidentiary burden has been described as both a *prima facie* showing and a probable cause showing. See *Decker*, 153 Ill. 2d at 322.

¶ 48                                                                III

¶ 49        Radojcic and Helfand urge us to reverse outright the judgment of the appellate court,
arguing that Helfand performed legitimate and routine legal services in connection with
Radojcic's real estate transactions, and that the State never contended that Helfand's work
was anything but lawful. We reject this argument. The focus of the crime-fraud exception is
on the intent of the client (*Radiac Abrasives, Inc. v. Diamond Technology, Inc.*, 177 Ill. App.
3d 628, 635 (1988)), not the legitimacy of the services provided by the attorney. An attorney
may be completely innocent of wrongdoing, yet the privilege will give way if the client
sought the attorney's assistance for illegal ends. *Clark*, 289 U.S. at 15. Although here, the
State also secured an indictment against the attorney, proof that Helfand participated in the
mortgage fraud scheme is a matter distinct from, and not a necessary condition for,
application of the crime-fraud exception.

¶ 50        Radojcic and Helfand also argue that the evidence submitted by the State was insufficient
to meet its burden under *Decker*. We disagree.

¶ 51        As set forth in greater detail earlier in this opinion, Patterson was a Radojcic employee
for 15 years and office manager of Jewel Windows. She was intimately involved in
Radojcic's business affairs and testified extensively about Radojcic's real estate transactions
and business practices. Patterson relayed that Radojcic, through several companies which,
on paper, were owned by her and Radojcic family members, purchased multiunit buildings,
converted them to condominiums, and sold the condominiums to straw buyers who
transferred the properties back to a Radojcic company. Thereafter, Radojcic would rent the
condominiums, primarily as section 8 housing. According to Patterson, Radojcic owed the
Internal Revenue Service $2 million, and Radojcic thus kept his name off of any corporate,
mortgage, real estate or financial documents. Radojcic used the Belmont and Cicero
Currency Exchange as a bank, funneling funds obtained at the real estate closings through
the exchange. Patterson also testified regarding the fraudulent statements made on the
mortgage applications, the methods used to inflate a straw buyer's assets, the manner in
which the appraisal process for the condominiums was influenced, and the process used to
insure that the lenders were unaware that a straw buyer was purchasing more than one
condominium unit at the same time.

¶ 52        Aranyos, one of the two straw buyers identified in the indictment, testified that Radojcic
hired her to work at Jewel Windows and that she understood Radojcic was the owner. She
explained how she had been approached by one of Radojcic's daughters about obtaining a
mortgage in her name, but for Radojcic's benefit. Although earning only $500 per week at
Jewel Windows, Aranyos was able to secure seven mortgages in her name to buy properties
she understood were in some way operated by Radojcic. Aranyos identified some of the
fraudulent means utilized by Radojcic's daughter and Patterson in the mortgage application
process: overstating salary, enhancing employment history, creating fictional gifts from
family members, and depositing funds, temporarily, into Aranyos' account.

¶ 53        Agent Hoffman's testimony regarding the joint investigation of Radojcic by federal
authorities was generally consistent with Patterson's testimony. Hoffman also verified that
Radojcic, through an entity known as B&B Properties, had received approximately $700,000

-11-

through the Department of Housing and Urban Development for his section 8 tenants.

¶ 54    As to the legal services Helfand provided, Aranyos testified that Helfand attended at least two of the closings representing either Radojcic or B&B Properties. Patterson testified that Helfand prepared the condominium conversion documents, and prepared and had recorded two deeds for each of the sales: one transferring the property from a Radojcic entity to the straw buyer, and one transferring the property from the straw buyer back to a Radojcic entity. Helfand also took direction from Patterson, and at times from Aranyos, as to which company Radojcic wanted the property conveyed, and how Radojcic wanted the sale proceeds divided. The division of proceeds included a payment to the straw buyer. Hoffman likewise testified as to Helfand's involvement in the condominium conversions and real estate closings, as well as Helfand's involvement in the transfer of the three units Kuljanin purchased into a land trust controlled by Patterson.

¶ 55    We conclude that the grand jury testimony satisfied the State's burden under *Decker* to provide "a reasonable basis to suspect the perpetration or attempted perpetration of a crime or fraud" by Radojcic. (Internal quotation marks omitted.) *Decker*, 153 Ill. 2d at 322. By all accounts, Radojcic was, to use the State's parlance, "at the center" of an elaborate scheme through which carefully structured real estate transactions became the vehicles through which he was able to defraud numerous lenders, as well as the Department of Housing and Urban Development, all the while keeping his name off of any documentation. We disagree with Radojcic that the State's evidence does not connect him to the fraudulent mortgage applications themselves. Although no evidence was offered that Radojcic completed or signed the mortgage applications, the implication of Patterson's and Aranyos' testimony is that Radojcic caused or prompted the making of the false mortgage applications. Helfand concedes this point.

¶ 56    We also conclude that the grand jury testimony satisfied the State's burden under *Decker* to provide a reasonable basis to suspect that Radojcic's communications with Helfand, to the extent they relate to the real estate transactions identified in the indictment, "were in furtherance" of the mortgage fraud scheme. *Id.* Contrary to the position advanced by Radojcic and Helfand, the State was not required to offer evidence that Radojcic communicated with Helfand regarding the fraudulent mortgage applications. The filing of the mortgage applications was but one step in the mortgage fraud scheme allegedly employed by Radojcic. That scheme began with Radojcic's acquisition of multiunit buildings, and included the conversion of those buildings to condominiums, the sale of the condominiums to straw buyers for a kickback, the transfer of the condominiums back to Radojcic, the eventual rental of the condominiums as section 8 housing, and the funneling of sale proceeds through the currency exchange. Thus, even if the communications between Radojcic and Helfand did not touch on the mortgage applications themselves, we agree with the State that any legal consultations between Radojcic and Helfand that related to the real estate transactions identified in the indictment furthered Radojcic's mortgage fraud scheme. As the appellate court observed, "Without the sales documents and the closings of the sales, the banks would not have loaned the straw purchasers the money." 2012 IL App (1st) 102698, ¶ 24.

¶ 57    We recognize that the State offered no evidence of direct communication between

Radojcic and Helfand. Rather, the implication of the grand jury testimony is that Radojcic communicated with Helfand through Patterson. Whether Patterson was acting as an agent of Radojcic or otherwise was not litigated in the trial court, and that issue is not properly before us. We need only determine whether the State offered sufficient evidence to suspect that Radojcic's communications with Helfand—however those communications were carried out—furthered Radojcic's mortgage fraud scheme. The State met its evidentiary burden.

¶ 58     Relying on *Mueller Industries, Inc. v. Berkman*, 399 Ill. App. 3d 456 (2010), Radojcic argues that "[w]ithout reviewing the communications themselves, no court can conclusively find that the crime-fraud exception applies to them." Thus, Radojcic maintains that, at a minimum, this case must be remanded for *in camera* examination of Helfand. We disagree.

¶ 59     *Decker* did not hold that *in camera* review is required in every case before a court can determine that the crime-fraud exception applies. Rather, *Decker* simply recognized the often difficult task of proving the exception using only evidence independent of the communication itself. *Decker*, 153 Ill. 2d at 322. Had this court intended *in camera* review to be a requirement in every case in which the crime-fraud exception is at issue, we would not have left the decision to conduct *in camera* review to the trial court's discretion. *Id.* at 324.

¶ 60     *Zolin*, on which *Decker* relied, also makes plain that *in camera* review is not indispensable to a showing that the crime-fraud exception applies. See *Zolin*, 491 U.S. at 575 n.13 (observing that, on remand, the court of appeals would have the opportunity to determine whether enough evidence was presented to establish that the sought-after tapes came within the crime-fraud exception, "even without *in camera* review of the tapes"). Moreover, we agree with *Zolin* that a blanket rule allowing or requiring *in camera* review as a tool for determining the applicability of the crime-fraud exception would place an undue burden on our trial courts. *Id.* at 571.

¶ 61     Radojcic's reliance on *Mueller* in support of *in camera* examination of Helfand is misplaced. In *Mueller*, the appellate court considered whether five categories of documents sought by the plaintiff, which the defendant maintained were subject to the attorney-client privilege, were discoverable under the crime-fraud exception. Relying on *Decker*, the appellate court remanded the matter to the trial court to conduct an *in camera* review of the documents to determine conclusively which documents, if any, furthered the defendant's alleged fraud. *Mueller*, 399 Ill. App. 3d at 472-73.

¶ 62     Although remand for *in camera* review may have been appropriate in *Mueller*, its analysis is flawed because it suggests that the proponent of the crime-fraud exception must make a *prima facie* showing before a court may hear evidence *in camera*. *Id.* at 470. As *Decker* makes plain, a lesser showing is required for *in camera* review. *Decker*, 153 Ill. 2d at 324. This inconsistency aside, the circumstances prompting *in camera* review in *Mueller* are absent from the instant case. We are not here faced with an extensive production request. Our task is simply to determine whether Helfand may testify about certain communications with Radojcic. We have already determined that any communication relating to the real estate transactions identified in the indictment furthered the alleged fraud and are not shielded by the attorney-client privilege. No reason exists for Helfand to be examined *in*

*camera* prior to testifying at trial.

¶ 63    Radojcic's fear, that *all* attorney-client communications between himself and Helfand will be subject to release unless Helfand is examined *in camera*, is unfounded. We reiterate that the only attorney-client communications subject to disclosure are communications that relate to the real estate transactions identified in the indictment. Communications between Radojcic and Helfand that relate to any other matter are yet shielded by the attorney-client privilege.

¶ 64                                      CONCLUSION

¶ 65    For the reasons stated, we affirm the judgment of the appellate court.

¶ 66    Affirmed.