2024 IL App (1st) 220642-U
No. 1-22-0642

FIRST DIVISION
March 11, 2024

**NOTICE:** This order was filed under Supreme Court Rule 23 and is not precedent except in the limited circumstances allowed under Rule 23(e)(1).

_____

IN THE
APPELLATE COURT OF ILLINOIS
FIRST JUDICIAL DISTRICT

_____

| | | |
|---|---|---|
| THE PEOPLE OF THE STATE OF ILLINOIS, | ) | Appeal from the Circuit Court |
| | ) | of Cook County. |
| Plaintiff-Appellee, | ) | |
| | ) | |
| v. | ) | No. 93 CR 7752 |
| | ) | |
| JOE SHERROD, | ) | |
| | ) | The Honorable |
| Defendant-Appellant. | ) | Angela Munari Petrone, |
| | ) | Judge Presiding. |

_____

JUSTICE PUCINSKI delivered the judgment of the court.
Presiding Justice Fitzgerald Smith and Justice Lavin concurred in the judgment.

**ORDER**

¶ 1     *Held:* The circuit court complied with our mandate when it allowed the parties to conduct a stipulated hearing. The circuit court did not err when it denied the defendant's petition for postconviction relief following a third-stage hearing.

¶ 2     Defendant, Joe Sherrod, appeals the dismissal of his successive postconviction petition following a third-stage evidentiary hearing. He argues that the circuit court failed to comply with our order reversing and remanding the case for a new third-stage evidentiary hearing by permitting the parties to stipulate at the remanded hearing to the testimony elicited at the initial

third-stage evidentiary hearing. Additionally, he argues that Delbert Heard and Claude McGee's eyewitness testimony is so conclusive that it would probably change the result on retrial. We affirm.

¶ 3                                    BACKGROUND

¶ 4        A jury convicted Sherrod of first degree murder for the murder of Rodriguez Myles. The circuit court sentenced him to a term of natural life. On direct appeal, we affirmed Sherrod's conviction and sentence. *People v. Sherrod*, No. 1-95-1534 (1997) (unpublished order under Supreme Court Rule 23). We also affirmed the summary dismissal of his two subsequent *pro se* postconviction petitions. *People v. Sherrod*, Nos. 1-96-3525, 1-97-3194 (consolidated) (unpublished order under Supreme Court Rule 23). We included only those facts that are pertinent to the resolution of the instant appeal.

¶ 5                                   A. Trial Evidence

¶ 6        At trial, Marci Ross testified that in the evening on March 5, 1993, Myles visited her at apartment 104 at 2900 South State Street, Chicago, Illinois. Her boyfriend, Joseph Lane, had previously lived with her, but did not have keys at the time. Myles slept in Ross's apartment until 7:30 a.m., when someone knocked on the door. Myles asked who was at the door, and they answered "Joe." Myles opened the door slightly, and he peaked through the narrow opening. Ross then heard four gunshots and Myles fell to the floor, mortally wounded. Shortly after, a bullet was fired through her kitchen window from outside of the building.

¶ 7        Jermaine Young testified that he had two felony drug convictions. He stated that he sold drugs for Sherrod from apartment 102 at 2900 South State Street. Sherrod also paid the rent for Young's apartment. Young acknowledged that Sherrod informed him that Myles also sold drugs

for Sherrod. Both Young and Myles were members of the Mickey Cobra street gang. Young stated that he occasionally sold drugs to Carol Scott and Denise Watson.

¶ 8     Young testified that he heard gunshots in the hallway on the morning of March 6, 1993. He then heard three more shots coming from outside the building. He looked out his window and saw Sherrod walk away from the building and drive off in his car. Young testified that Sherrod returned to the apartment building approximately four hours after the shooting. Sherrod told Young that, "[y]ou know in your heart that the brothers think I did this." Sherrod advised Young to ask for an attorney if Young was arrested. Sherrod threatened to kill Young if he went to jail for something he did not do. On cross-examination, Young stated that Sherrod never admitted that he killed Myles.

¶ 9     Scott and Watson testified that they were in apartment 204 of the 2900 South State Street apartment building at 7:30 a.m. on March 6, 1993, when they heard gunshots. Both women looked out the window and saw Sherrod shooting into the window of the apartment below their apartment. Scott testified that she knew Sherrod for approximately 25 years. Both women testified that they saw Sherrod pocket the gun and walk away smiling.

¶ 10     Sherrod came to their apartment the following day and asked the women about the shooting. The women told him that someone named "Joe" was a suspect in the shooting. Sherrod denied any involvement. Watson told Sherrod that they had seen him shooting in the courtyard. Sherrod smiled and replied, "y'all seen me, huh?" They informed Sherrod that they told Young that they witnessed Sherrod shooting into the building. Sherrod became upset because he believed that Young would "break." Scott testified that Sherrod told them not to tell anyone else, and Watson testified that Sherrod threatened to kill anyone who "point[ed] the finger at him."

¶ 11 After Sherrod left the apartment, the women decided to walk to the next building to use a telephone. They intended to walk to a police station, but they reconsidered when they saw Sherrod outside. Instead, they asked Sherrod to drive them to Watson's house "to keep him from thinking that [they were] going to tell." Sherrod drove them to Watson's house. Scott testified that while they were in Sherrod's car, he told them that "he tried to get the [Mickey Cobra street gang] to think that Folks done it on the other end." Both women testified that Sherrod told them that if he was arrested, he would "bond out" and kill anyone who "pointed the finger [at him]." After Sherrod dropped them off and then drove away, the two women walked to a nearby police station and reported what they witnessed.

¶ 12 After Sherrod's arrest, he was placed in a lineup and identified as the shooter by Scott, Watson, and Young.

¶ 13 Ernest Warner, a firearms examiner for the Chicago Police Department, testified that the five bullet casings recovered from inside the building hallway and the five bullet casings recovered from outside the building were all fired from the same weapon. Further, each of the four bullets recovered were fired from the same barrel.

¶ 14 The jury found Sherrod guilty of first degree murder. The circuit court sentenced him to a term of natural life. On direct appeal, we affirmed Sherrod's conviction and sentence. *Sherrod*, No. 1-95-1534 (1997) (unpublished order under Supreme Court Rule 23). We also affirmed the summary dismissal of his two subsequent *pro se* postconviction petitions. *People v. Sherrod*, Nos. 1-96-3525, 1-97-3194 (consolidated) (unpublished order under Supreme Court Rule 23).

¶ 15 B. Postconviction Proceedings

¶ 16 In 2002, Sherrod filed a *pro se* successive postconviction petition wherein he asserted a claim of actual innocence. Sherrod attached the affidavits of Brian Lacey and Carrie Williams,

who were unavailable at trial. The circuit court appointed postconviction counsel to represent Sherrod. Sherrod then requested leave to file an amended petition *pro* se to address timeliness issues. The State filed a motion to dismiss his successive petition arguing that it was untimely, and that the allegations lacked merit.

¶ 17    In 2004, Sherrod filed a second amended *pro se* petition wherein he alleged additional newly discovered evidence of actual innocence in the form of an affidavit from Marvin Grant. The State filed a second motion to dismiss. The circuit court granted the State's motion to dismiss. Sherrod appealed.

¶ 18    In 2010, while Sherrod's appeal was pending, he requested leave to file a second successive postconviction petition where he alleged a claim of actual innocence based on newly discovered evidence in the form of the affidavits from McGee and Heard. The circuit court denied Sherrod leave to file a second successive postconviction petition. Sherrod filed a notice of appeal.

¶ 19    As for Sherrod's appeal from the circuit court's judgment granting the State's motion to dismiss his previous successive petition, we reversed the dismissal and remanded the cause for third-stage proceedings. *People v. Sherrod*, 2011 IL App (1st) 090590-U. On remand, Sherrod's postconviction counsel filed a motion to amend the witness list for the evidentiary hearing. In the motion, Sherrod argued that the addition of Heard and McGee would be in the best interest of judicial economy and expediency. The circuit court granted his motion with no objection from the State. We subsequently granted Sherrod's own motion to dismiss his appeal from the circuit court's judgment denying him leave to file a second successive postconviction petition.

¶ 20    In 2015, at the evidentiary hearing, Sherrod did not present the testimony of Lacey, Williams, or Grant. Rather, Sherrod presented the testimony of Heard and McGee.

¶ 21    Heard testified that he witnessed a shooting in the building located at 2900 South State Street. The shooting took place between approximately 7:30 a.m. and 8:30 a.m. in early March of 1993. Heard testified that he walked into the building and "there was a guy shooting into the apartment." He did not speak to anyone at the building before the shooting occurred. He did not remember the apartment number. The shooter was approximately 30 to 40 feet in front of him. Heard did not recognize the shooter. The shooter wore all red including a red baseball cap. The shooter was approximately six feet tall, and he wore his hair in braids. Heard observed the shooter for no more than a few seconds before he ran to his truck. Heard testified that did not know whether anyone else was inside the building besides the shooter.

¶ 22    Heard further testified that later that day the police stopped him in a McDonald's parking lot. The police questioned him about the shooting. Approximately a day or so later, the police contacted Heard to view a lineup.  Heard did not identify the shooter in the lineup. Heard testified that he did not recall whether Sherrod was in the lineup.

¶ 23    On cross-examination, Heard testified that he first met Sherrod in prison. Heard was serving a life sentence and his incarceration began in approximately 2008. Heard admitted that he lived far from the location of the shooting. However, he claimed he went to the building to drive a "Miss Harris" to the grocery store as a favor for his friend Darryl Johnson. Although, Heard testified that he previously drove Miss Harris to the grocery store on other occasions, he could not remember the name of the grocery store and claimed to not know Miss Harris's first name. Heard testified that the lineup took place at "51st and Wentworth." Heard admitted that he was out on bond for attempted murder at the time.

¶ 24    Heard stated that he overheard Sherrod discussing his case in the prison law library, and he told Sherrod that "I think I was there that day."  Heard admitted that he was uncertain whether

he witnessed the crime for which Sherrod was convicted. Heard testified that Sherrod typed his affidavit, and that "[Sherrod] clarified a few things in it that [Heard] was vague about." Heard and McGee may have been housed together in prison. Heard knew McGee. Heard did not remember whether he saw McGee at the shooting.

¶ 25    On redirect, Heard testified that the shooter was not Sherrod. When asked whether he filled out the affidavit, he responded: "It was my content, but he helped me [with] a few things I was vague on. You know, specifics. Did I get these from a (Unintelligible.) Where the police station was and stuff like that. We came to an agreement on certain things, but it was basically my content."

¶ 26    On recross-examination, Heard testified that the police officers that interviewed him took notes of their conversation. After he viewed the lineup, no one contacted him about the shooting. Heard doubted that he could identify the shooter at the time of the hearing which was approximately twenty-two years after the incident.

¶ 27    McGee testified that, on a Saturday in early March 1993, at approximately 7:30 a.m., he was standing outside of the 2900 South State Street building with a group of guys. Prince Joe approached the group and asked whether anyone had seen Reno. McGee stated that he knew of Reno who was a Mickey Cobra. Prince Joe then walked into the building and knocked on the door of apartment 104. McGee was maybe two car lengths away when Prince Joe knocked on the door. Someone opened the door, and Prince Joe removed a gun from his waistband. McGee did not see the gun, but he heard the shots. Prince Joe fired four to five shots. After McGee heard the shots, he ran away. McGee did not know Sherrod at that time, and he did not see him that morning. McGee testified that he wrote the initial affidavit, but since there were a lot of

"mistakes," Sherrod typed it out for him. McGee stated that he was certain that Sherrod was not the shooter.

¶ 28    On cross-examination, McGee acknowledged that he did not live near the 2900 South State Street Building, but he claimed that he hung out in the area since his sister went to high school nearby. McGee stated that he was a member of the "Bad Boys" faction of the Mickey Cobras. He described Prince Joe as approximately six feet tall, about 230 pounds, and wearing braids. Prince Joe wore a red jacket, red shoes, and red pants but no hat. McGee learned that someone died during the shooting he witnessed about a week later, but he did not inform the police. McGee did not know Prince Joe's real name. In his affidavit, he claimed to have specialized knowledge of the Mickey Cobra street gang hierarchy and membership, and he knew an individual named "Prince Joe" who was the highest-ranking member of the gang.

¶ 29    McGee testified that he first met Sherrod in approximately 2002 at Menard Correctional Center (Menard). He was moved to Pontiac Correctional Center in approximately November 2004. Sherrod approached McGee at Menard, and asked McGee about the shooting. McGee did not want to get involved at the time because he was concerned the Mickey Cobras would harm his family. McGee claimed that he did not remember being interviewed by assistant state's attorney Darren O'Brien and investigator Daniel Branigan in 2013. He claimed he did not remember the interview because he was on medication at the time. McGee claimed that he and Sherrod were not close associates. McGee stated that he knew Heard and Lacey.

¶ 30    The State then presented the testimony of Marci Ross, Jospeh Lane, and Daniel Branigan.

¶ 31    Ross testified that she lived at 2900 South State Street in March 1993. At that time, she was dating Lane who was not a member of a street gang, nor was he involved with the Mickey Cobras. On March 6, 1993, at approximately 7:30 a.m., someone knocked on the door of her

apartment. Myles, her friend who stayed over her apartment the night before, answered the door. Ross heard the individual outside the front door say "Joe." Ross did not think it was her boyfriend Lane since he typically came at night after work, and normally called her before he did.

¶ 32 Ross testified that Myles attempted to close the door, and a struggle ensued with the individual on the other side of the door. Ross then heard about four to five gunshots. Myles tried to hold onto to something before falling over. Ross sat still for a few minutes. Then, another bullet came through her kitchen window. She waited another five to ten minutes before she left her apartment and went to a neighbor's apartment where she called the police. Ross did not know an individual named Prince Joe. She did not know of any other Joes in her building that were approximately six feet tall and weighed 230 pounds. To her knowledge, Myles did not hang out with any other Joes.

¶ 33 On cross-examination, Ross clarified that she lived at 2900 South State Street in apartment 104. She first met Lane in 1991 or 1992. He lived with his mother. Ross did not see the shooter. The police asked Ross if she knew a Joe, and she initially told them that she did not.

¶ 34 On redirect examination, Ross acknowledged that she did not review her trial testimony prior to the hearing. Ross testified that she did not initially mention Lane to the police because he did not immediately come to mind. Lane was not a violent person, nor would he come to her apartment without first asking her. She clarified that there were gang wars, and frequent shootings. She would tell Lane whether it was safe for him to visit. On recross-examination, she stated that it was not Lane's voice on the other side of her front door.

¶ 35    Lane testified that, from 1995 to 1999, he worked in the military. He married Ross in 1999, but they later divorced. At the time of the hearing, Lane worked out of state for a major airline.

¶ 36    In March 1993, Lane worked two jobs and he attended school. He dated Ross who lived at 2900 South State Street. On March 6, 1993, after the shooting, the police questioned Lane at the police station. He went home later that night, and he did not have any further participation in the case. He was never a member of any street gang. Lane testified that he was approximately five feet five inches tall, and he weighed approximately 165 pounds. He did not associate with anyone else at Ross's building other than Ross.

¶ 37    Brannigan, an investigator for the Cook County State's Attorney's Office, testified that he reviewed  the police reports related to the shooting. He also reviewed Heard's affidavit submitted in this case. In the police reports, he did not find any mention of the substance of Heard's claim that the police questioned him and contacted him for a lineup. Brannigan and assistant state's attorney O'Brien interviewed Heard on March 29, 2013. During the interview, Heard said that he could not identify the shooter since he only saw the shooter for a brief second.

¶ 38    Brannigan and O'Brien also interviewed McGee on April 5, 2013. McGee said that he was not under the influence of any drugs during the interview. Brannigan agreed that McGee did not appear impaired in any way during the interview. McGee stated that he knew Prince Joe. Prince Joe approached Heard with a crazy look in his eyes and, without saying anything, started shooting. McGee did not state that Prince Joe asked for someone named Reno prior to shooting. McGee denied knowing anyone named Reno, but he stated that the name was somewhat familiar. McGee recalled hearing only one gunshot before he ran. McGee claimed the shooting took place at approximately 6:00 or 7:00 p.m. He did not know how many times Prince Joe fired the gun.

McGee claimed that he was a Mickey Cobra unaffiliated with Sherrod. McGee stated that he became acquainted with Sherrod at the Muslim Chapel in prison. After they became acquainted, McGee decided to inform Sherrod that he witnessed the shooting.

¶ 39    Following the third-stage evidentiary hearing, the circuit court dismissed Sherrod's successive petition for postconviction relief. Sherrod appealed. On appeal, we determined that the circuit court applied the wrong standard to Sherrod's actual innocence claim. *People v. Sherrod*, 2018 IL App (1st) 160723-U. Specifically, we stated "we reverse the judgment of the circuit court of Cook County and remand the cause for a new third-stage evidentiary hearing to be conducted under the appropriate standard for ultimate relief on an actual innocence claim." *Id.* ¶ 40.

¶ 40    On remand, Sherrod's postconviction counsel informed the court that Sherrod wanted to proceed by stipulation. Specifically, postconviction counsel stated: "I have spoken to Mr. Sherrod, and he tells me that he does not want to redo the evidentiary hearing, he wants to basically stipulate to the evidence that was proffered at the original evidentiary hearing, and then just, we'll have new arguments." The State agreed to proceed by stipulation.

¶ 41    At the remanded third-stage hearing, the parties stipulated to the testimony presented at the prior third-stage hearing. The parties then made closing arguments.  The circuit court found that Heard and McGee's testimony was not of such conclusive character that it would probably change the outcome on retrial. The circuit court determined that Heard and McGee lacked credibility based on their criminal convictions, Sherrod drafting their affidavits which tainted the reliability of the affidavits, and their willingness to remain silent until after becoming acquainted with Sherrod in prison. The circuit court stated that their testimonies were severely impeached and contradicted by physical evidence and the testimonies of credible eyewitnesses. Further, the

court found that Sherrod's actions, threats, and statements showed consciousness of guilt, and lent credibility to Scott, Watson, and Young's identification of him. The circuit court denied Sherrod's petition for postconviction relief.

¶ 42     Sherrod appeals.

¶ 43                                   ANALYSIS

¶ 44                               A. Invited Error

¶ 45     On appeal, Sherrod first argues that the circuit court failed to comply with our order reversing and remanding the case for a new third-stage evidentiary hearing by permitting the parties to stipulate at the remanded hearing to the testimony elicited at the initial third-stage evidentiary hearing. See *People v. Sherrod*, 2018 IL App (1st) 160723-U. The State responds that the circuit court complied with our order since it conducted a new third-stage hearing, and that Sherrod should be estopped from raising this alleged error since he requested to proceed by stipulation.

¶ 46     It is well established that "an accused may not request to proceed in one manner and then later contend on appeal that the course of action was in error." *People v. Carter*, 208 Ill. 2d 309, 319 (2003). To allow otherwise would offend all notions of fair play, and encourage duplicity. *People v. Harvey*, 211 Ill. 2d 368, 385 (2004). "[A] defendant's invitation or agreement to the procedure later challenged on appeal 'goes beyond mere waiver.' " *Harvey*, 211 Ill. 2d at 385 (2004) (quoting *People v. Villarreal*, 198 Ill. 2d 209, 227 (2001)). Invited error creates an estoppel that precludes plain-error analysis. *People v. Holloway*, 2019 IL App (2d) 170551, ¶ 55.

¶ 47     Sherrod does not dispute that he requested that the parties stipulate to the testimony heard at the prior third-stage hearing. However, he asserts that the circuit court's error rendered the judgment void.

¶ 48       A void judgment can be attacked at any time. *People v. Flowers*, 208 Ill. 2d 291, 308 (2003). Thus, a void judgment is excluded from the invited-error doctrine. *People v. Smith*, 406 Ill. App. 3d 879, 887 (1st Dist. 2010). Only the lack of jurisdiction renders a judgment void. *People v. Raczkowski*, 359 Ill. App. 3d 494, 497 (1st Dist. 2005). Since "[i]t is well recognized that 'a reviewing court's mandate vests a [circuit] court with jurisdiction only to take action that complies with the reviewing court's mandate' " (*Fleming v. Moswin*, 2012 IL App (1st) 103475-B, ¶ 28 (quoting *People v. Winters*, 349 Ill. App. 3d 747, 749 (1st Dist. 2004)), we must determine whether the circuit court complied with our order when it allowed the parties to stipulate at the remanded hearing to the testimony elicited at the initial third-stage evidentiary hearing.

¶ 49       "After a remand, the [circuit] court is required to exercise its discretion within the bounds of the remand." *Clemons v. Mechanical Devices Co.*, 202 Ill. 2d 344, 351 (2002). "After a judgment is reversed and the cause remanded, the [circuit] court can hold only such further proceedings as conform to the judgment of the appellate [court]." *Id.* at 352-53. Additionally, a reviewing court is not required to state specific directions in an order reversing a judgment and remanding a cause. *Id.* at 353. Rather, it is the duty of the circuit court to examine the reviewing court's order, and to proceed in conformity with the views expressed in it. *Id*. We review *de novo* whether the circuit court complied with our order. *Id*. at 351-52.

¶ 50       Sherrod argues that our order makes clear that the remanded hearing required live testimony. He notes that a portion of our order concerned the circuit court's flawed credibility determinations. See *Sherrod*, 2018 IL App (1st) 160723-U, ¶ 37-38. He then argues that the new evidentiary hearing required live testimony to make appropriate credibility determinations since a witness's conduct and demeanor play a role in determining their credibility, and that those

determinations cannot be made from a cold record. Citing *People v. Delton*, 227 Ill. 2d 322, 332 (2008). Additionally, Sherrod argues that if we wanted a review of the transcripts with the appropriate standard applied, we would have reviewed the record ourselves and corrected the errors on his prior appeal. Citing *People v. Radojcic*, 2013 IL 114197, ¶ 34 (trial court does not occupy a position superior to reviewing courts in evaluating evidence that is not live testimony). The State responds that our mandate did not prohibit the parties from stipulating to the prior testimony, and that the only specific direction provided was to apply the correct standard.

¶ 51 Our prior order stated that we "remand the cause for a new third-stage evidentiary hearing to be conducted under the appropriate standard for ultimate relief on an actual innocence claim." *Sherrod*, 2018 IL App (1st) 160723-U, ¶ 40. Our supreme court noted that although the words "evidentiary hearing" do not appear in the Act, the third-stage hearing has come to be called an "evidentiary hearing." *Johnson*, 206 Ill. 2d at 357-58. They then concluded that a third-stage hearing does not require live testimony. *Id*. at 358. A third-stage hearing does not require live testimony because section 122-6 of the Act—which governs third-stage hearings—states that "[t]he [circuit] court *may* receive proof by affidavits, depositions, oral testimony, or *other evidence*." (Emphasis added.) 725 ILCS 5/122-6 (West 2016). Further, we note that it is common practice for a judge to make credibility determinations based on transcripts of testimony from a prior hearing (*Smith v. Freeman*, 232 Ill. 2d 218, 230 (2009)), since factors other than a witness's demeanor and conduct factor into the decision whether to believe a witness (*Anderson v. City of Bessemer City, N.C.*, 470 U.S. 564, 575 (1985) (other objective evidence may contradict a witness's story or the story may be internally inconsistent)). Thus, since our prior order did not explicitly require live testimony, but only required a new third-stage hearing, the parties were

allowed to conduct the new hearing as they saw fit, and the circuit court complied with our order by allowing the parties to do so.

¶ 52    Since we determined that the circuit court's order was not void for lack of jurisdiction, we may consider the merits of Sherrod's appeal. *People v. Flowers*. 208 Ill. 2d 291, 307 (2003).

¶ 53                                B. Actual Innocence

¶ 54    Sherrod next argues that Heard and McGee's eyewitness testimony is so conclusive that it would probably change the result on retrial. He claims that the State did not present any eyewitness testimony or physical evidence tying him to the shooting at trial. The State responds that Sherrod's argument ignores the eyewitnesses that identified him shooting into the apartment from outside, and the ballistics evidence that established that the same weapon was used for both the shooting inside the apartment building and outside the apartment building.

¶ 55    The Post-Conviction Hearing Act (Act) (725 ILCS 5/122-1 *et seq*. (West 2018)) provides a three-stage process by which criminal defendants may assert that a substantial denial of their constitutional rights resulted in their conviction. *People v. Hodges*, 234 Ill. 2d 1, 9 (2009). If, at the second stage, the petition makes a substantial showing of a constitutional violation, the matter proceeds to a third-stage hearing on the merits of petitioner's claims. *People v. Johnson*, 206 Ill. 2d 348, 357 (2002). The Act contemplates the filing of a single petition since any claim not raised in the original or amended petition is waived. 725 ILCS 5/122-3 (West 2018). However, a petitioner's failure to raise a claim in an earlier petition will be excused if they set forth a claim of actual innocence. *People v. Ortiz*, 235 Ill. 2d 319, 329-30 (2009).

¶ 56    "To succeed on a claim of actual innocence, the defendant must present new, material, noncumulative evidence that is so conclusive it would probably change the result on retrial." *People v. Coleman*, 2013 IL 113307, ¶ 96. "[T]he conclusive character element refers to

evidence that, when consider along with the trial evidence, would probably lead to a different result." *People v. Robinson*, 2020 IL 123849, ¶ 47. The question is whether the evidence places the evidence presented at trial in a different light and undercuts the court's confidence in the initial verdict. *Coleman*, 2013 IL 113307, ¶ 97. The evidence need not be entirely dispositive. *Id.* "Probability, rather than certainty, is the key in considering whether the fact finder would reach a different result after considering the prior evidence along with the new evidence. *Robinson*, 2020 IL 123849, ¶ 48. At a third-stage hearing, the defendant bears the burden of showing a deprivation of his constitutional rights by a preponderance of the evidence. *Coleman*, 2013 IL 113307, ¶ 92.

¶ 57        After a third-stage hearing where fact-finding and credibility determinations are involved, the circuit court's decision will not be reversed unless it is manifestly erroneous. *People v. English*, 2013 IL 112890, ¶ 23. "[A] decision is manifestly erroneous when the opposite conclusion is clearly evident." *Coleman*, 2013 IL 113307, ¶ 98 (quoting *People v Morgan*, 212 Ill. 2d 148, 155 (2004). However, we apply a *de novo* standard of review if no such determinations are necessary at the third stage, i.e., *no new evidence* is presented, and the issues presented are pure questions of law. (Emphasis added). *Id.* In this case, we review the circuit court's decision for manifest error since the court reviewed new evidence in the form of stipulated testimony. See *People v. Brown*, 2013 IL App (1st) 091009, ¶¶ 35, 53.

¶ 58        We agree with the circuit court that Heard and McGee lacked credibility. Heard admitted that he was uncertain about whether he witnessed the crime for which Sherrod was convicted. He stated that he initially told Sherrod that he was uncertain whether he witnessed the shooting. Additionally, Heard informed Brannigan that he could not identify the shooter since he only saw the shooter for a brief second. Yet, he testified that Sherrod—someone he did not meet until

approximately 15 years after the shooting—was not the shooter. Moreover, Brannigan could not verify the substance of Heard's claim that the police questioned him and contacted him for a lineup.

¶ 59    In McGee's interview with Brannigan, he told Brannigan that the shooting happened at approximately 6:00 or 7:00 p.m. He did not mention that Prince Joe asked for someone named Reno prior to shooting. He only heard one gunshot, and he was not sure how many shots were fired. These statements to Brannigan were inconsistent with the testimony that McGee provided at the third-stage hearing. We find it notable that McGee claimed not to remember this interview. Additionally, McGee claimed to be a Mickey Cobra with a specialized knowledge of the gang's membership, yet he did not know Prince Joe's real name.

¶ 60    Outside of the internal inconsistencies in Heard and McGee's testimony, their testimony is further contradicted by the eyewitness testimony of Scott, Watson, and Young; the bullet casings recovered from the shooting; and Sherrod's statements, threats, and actions after the shooting.

¶ 61    Scott and Watson testified that they witnessed Sherrod shooting into the window of apartment 104. Young testified that after he heard the gunshots outside the building, he looked out his window and saw Sherrod walk away from the building and drive off in his car. The recovered bullet casings established that the same gun was fired inside the hallway of the building, and outside of the building. Sherrod's threats to Scott, Watson, and Young established his consciousness of guilt (*People v. McCullough*, 2015 IL App (2d) 121364, ¶ 95 (threats to intimidate or kill witnesses is proof of consciousness of guilt)), and further lent credibility to their testimony. Likewise, Sherrod's statement that he attempted to convince the Mickey Cobras

to think that "Folks done it on the other end," and his fear that Young would "break" similarly indicated a consciousness of guilt.

¶ 62        Heard and McGee's incredible testimony fails to place the evidence presented at trial in a different light and undercut confidence in the initial verdict. *Coleman*, 2013 IL 113307, ¶ 97. Thus, the circuit court did not err when it denied Sherrod's petition following a third-stage hearing.

¶ 63                                        CONCLUSION

¶ 64        For the reasons stated above, we affirm the judgment of the circuit court of Cook County.

¶ 65        Affirmed.