NOTICE

Decision filed 03/08/22. The text of this decision may be changed or corrected prior to the filing of a Petition for Rehearing or the disposition of the same.

2022 IL App (5th) 190205-U

NO. 5-19-0205

IN THE

APPELLATE COURT OF ILLINOIS

FIFTH DISTRICT

NOTICE

This order was filed under Supreme Court Rule 23 and is not precedent except in the limited circumstances allowed under Rule 23(e)(1).

| | | |
|---|---|---|
| THE PEOPLE OF THE STATE OF ILLINOIS, | ) | Appeal from the |
| | ) | Circuit Court of |
| Plaintiff-Appellee, | ) | Jefferson County. |
| | ) | |
| v. | ) | No. 17-CF-167 |
| | ) | |
| ABAGAIL ADKINS, | ) | Honorable |
| | ) | Jerry E. Crisel, |
| Defendant-Appellant. | ) | Judge, presiding. |

JUSTICE CATES delivered the judgment of the court.
Justices Welch and Wharton concurred in the judgment.

**ORDER**

¶ 1    *Held*:  The defendant's case is remanded to the trial court for a new trial and the appointment of new counsel because the defendant received ineffective assistance of counsel where defense counsel consented to the police interviewing the defendant, without counsel being present.

¶ 2    The defendant appeals her conviction and sentence for the offense of aggravated battery of a child (720 ILCS 5/12-3.05(b)(1) (West 2016)). The defendant was found guilty of this offense under a theory of accountability. On appeal, the defendant raises numerous claims regarding her counsel's performance in the proceedings below. For the following reasons, we vacate the defendant's conviction and sentence, and remand this case to the trial court for a new trial and appointment of new counsel.

1

¶ 3                                    BACKGROUND

¶ 4     On December 12, 2016, the defendant, Abagail Adkins, gave birth to L.S. at 28 weeks, 2 days. L.S. was admitted to the Neonatal Intensive Care Unit (NICU) at St. Mary's Hospital in St. Louis, Missouri. On January 23, 2017, L.S. was transferred from St. Mary's to the NICU at Cardinal Glennon Hospital in St. Louis. On February 20, 2017, L.S. was discharged from Cardinal Glennon on cardiorespiratory monitoring. Follow up doctor appointments for L.S. were scheduled for February 22, 2017, and March 14, 2017. After L.S. was discharged from the hospital, the defendant and codefendant Tyrone Steele, L.S.'s father, took L.S. to their home in Mt. Vernon, Illinois.

¶ 5     On April 3, 2017, Jeff McElroy, an investigator for the Department of Children and Family Services (DCFS), was assigned to investigate an allegation of medical neglect involving L.S. It had been alleged that the defendant Steele had missed doctor appointments for L.S. and that L.S.'s heart monitor was not being used properly. McElroy subsequently met with the defendant and Steele at their home and observed L.S. asleep in the crib. McElroy did not observe anything abnormal about L.S. and did not have the defendant wake or undress L.S. McElroy did make recommendations to the defendant and Steele about not keeping certain items in the crib with L.S. McElroy also discussed the missed doctor appointments with the defendant. The defendant claimed that she did not have transportation to get to and from the appointments. McElroy offered the defendant and Steele "services" at that time and told them that an appointment would need to be scheduled so that L.S. could be seen at Cardinal Glennon.

¶ 6     On April 20, 2017, the defendant took L.S. to Cardinal Glennon for a doctor's appointment. The neonatologist at Cardinal Glennon became concerned because L.S. had an enlarged head. An ultrasound and CT scan revealed that L.S. had bleeding between the skull and brain. L.S. was

2

admitted to the hospital for further evaluation. Other tests, including an MRI of the head and a skeletal survey, showed that L.S. had 14 rib fractures, a skull fracture with brain tissue injury, and intraretinal hemorrhaging. Dr. Tim Kutz, an expert in child abuse pediatrics, was contacted. Dr. Kutz opined that these types of injuries were the result of abuse.

¶ 7 On April 21, 2017, Detective Justin Haney of the Mt. Vernon Police Department received a report that L.S. had sustained injuries consistent with child abuse. McElroy had also been informed of the injuries. That day, McElroy and Detective Haney responded to Cardinal Glennon and spoke with Dr. Kutz and the defendant. The defendant claimed that she did not know the cause of L.S.'s injuries. The defendant alleged that L.S.'s injuries must have been the result of L.S. rolling off the couch. The defendant indicated that only she and Steele had access to and provided care for L.S. McElroy subsequently contacted his supervisor, and L.S. was taken into protective custody.

¶ 8 On April 28, 2017, Detective Haney interviewed the defendant at the Mt. Vernon Police Department and questioned the defendant about the cause of L.S.'s injuries. The defendant continued to claim that she did not know the cause of L.S.'s injuries and stated that she never saw Steele lose his temper with L.S. The defendant subsequently stated, however, that Steele appeared to hug L.S. too hard and described this as a "bear hug." The defendant also stated that Steele had performed CPR on L.S.

¶ 9 On May 11, 2017, the State charged the defendant and Steele each with the offense of aggravated battery of a child (720 ILCS 5/12-3.05(b)(1) (West 2016)). Count I alleged that Steele committed battery (720 ILCS 5/12-3 (West 2016)) against L.S., a child under the age of 13, and knowingly caused great bodily harm to L.S. by causing L.S. to suffer brain injuries, retinal hemorrhages, and broken ribs. Count II charged the defendant with the same offense and alleged

3

that she was accountable for Steele's conduct. The defendant and Steele were subsequently indicted for the same offenses contained in the information.

¶ 10     On May 12, 2017, the defendant, who was in custody at the time, appeared before the trial court via video. The trial court advised the defendant regarding the charge, potential penalties, and bail. The defendant requested the public defender, and defense counsel was appointed to represent the defendant.

¶ 11     On May 13, 2017, the defendant reached out to a correctional officer at the jail, indicating that she wished to speak with Detective Haney. On May 15, 2017, Detective Haney was advised that the defendant wished to speak with him. Because counsel had been appointed to represent the defendant, Detective Haney and his supervisor contacted the state's attorney's office. Defendant's counsel was subsequently contacted and gave his consent for Detective Haney to speak with the defendant. Detective Haney responded to the jail where he interviewed the defendant. Defense counsel was not present for the interview.

¶ 12     When the defendant was brought into the interview room at the jail, the defendant indicated that she believed she was speaking with a lawyer. Before interviewing the defendant, Detective Haney confirmed that the defendant knew counsel had been appointed to represent her. Detective Haney advised the defendant that she was not obligated to speak with him and that she had the right to speak with counsel first or have counsel present during the interview. The defendant indicated that she understood her rights but still wished to speak with Detective Haney. The defendant was read her *Miranda* rights and indicated that she understood those rights. Detective Haney then proceeded to interview the defendant.

¶ 13     During this interview, the defendant provided several additional explanations for L.S.'s injuries. The defendant stated that Steele had pushed down on L.S.'s chest approximately five

times to stop L.S. from crying. The defendant believed that Steele pushed down hard enough to stop L.S. from breathing. The defendant also stated that Steele had pushed down on L.S. with a pillow, causing L.S. to turn blue. The defendant further stated that on another occasion, Steele "slung" L.S. onto the couch after he threw up on Steele. Finally, Steele had reported an incident to the defendant indicating that Steele had thrown a full bottle into the crib, hitting L.S. in the forehead. This incident caused L.S. to develop a bruise and knot on his forehead. The defendant also discussed her relationship with Steele while she was pregnant with L.S. The defendant reported that Steele had pushed the defendant down and sent the defendant messages indicating that he did not want to have a baby with the defendant, stating "why can't you have a miscarriage or get rid of it."

¶ 14    On May 24, 2018, the defendant sent a letter to the trial court raising concerns regarding her case. The defendant advised the trial court that her counsel was unable to explain to her certain medical terms contained in the medical records that were included in discovery, and that the defendant believed that medical records from December 12, 2016, through January 23, 2017, were missing from the documents produced in discovery. The defendant also advised the trial court that she had not seen the video statements made by her, Steele, or any other witnesses. The defendant indicated that statements she made against Steele were false and that she never saw Steele abuse L.S. The defendant also indicated that defense counsel had advised her that the State would "cut [the defendant] a deal" if she testified against Steele. The trial court placed this letter under seal.

¶ 15    On May 30, 2018, defense counsel filed a "Motion Regarding Fitness of Defendant Abigail Adkins." In this motion, defense counsel alleged that he had a *bona fide* doubt as to the defendant's mental fitness to stand trial. Defense counsel asserted that several of the allegations made in the defendant's letter to the court were "untrue." Defense counsel provided that he had reviewed the

5

medical evidence with the defendant during a jail visit and that she did not express concern regarding counsel's understanding of the medical terms contained in the records produced in discovery. Defense counsel further indicated that the defendant did not state that she believed any necessary medical reports were missing from discovery. Defense counsel also asserted that the State had "just provided" the video statements, but that counsel had been in possession of all audio statements and had discussed those statements in detail with the defendant. Finally, defense counsel asserted that the defendant did not appear to understand the concepts of use immunity, contempt of court, or perjury. Defense counsel concluded that the defendant was either:

> "a) so forgetful that she cannot adequately assist Defense Counsel with the preparation of her trial and so forgetful that she could not be capable of providing reliable testimony ***;
>
> b) operating with such a low level of intelligence that she cannot adequately assist Defense Counsel with the preparation of her trial and of such a low level of intelligence that she could not be capable of providing reliable testimony ***;
>
> c) operating with a mental illness/episode that has manifested itself over the last few weeks;
>
> d) operating under duress ***;
>
> OR [*sic*]
>
> e) lying."

Defense counsel further concluded that "[i]f [s]cenario a), b) or c) above is the case, then the Defendant Adkins cannot stand trial until such deficiencies are remedied and she is restored to fitness." Defense counsel attached his affidavit affirming the allegations set forth in the fitness motion and a copy of the defendant's letter to the court.

6

¶ 16    Following a hearing on the fitness motion, the trial court entered an order for a fitness evaluation, finding that a *bona fide* doubt as to the defendant's fitness for trial, to plead, or to be sentenced had been raised. The trial court appointed Dr. Angeline Stanislaus to conduct a fitness examination of the defendant. After meeting with the defendant, Dr. Stanislaus filed a fitness report concluding that the defendant was fit to stand trial. At the hearing on whether the defendant was fit to stand trial, Dr. Stanislaus's report was admitted without objection, and no other evidence was presented. Defense counsel indicated that he had met with the defendant and was now satisfied that the defendant understood the "key terms" he raised in his motion. Defense counsel further indicated that the defendant was "presenting herself in a way consistent with Dr. Stanislaus's report," and stipulated that the defendant was fit to stand trial. The trial court entered an order finding the defendant fit to stand trial.

¶ 17    On July 10, 2018, the trial court held a status hearing. At this hearing, defense counsel informed the trial court that the defendant had sent counsel a letter, indicating that the defendant wished to represent herself. The trial court then admonished the defendant regarding the waiver of counsel pursuant to Illinois Supreme Court Rule 401 (eff. July 1, 1984). After being admonished, the defendant indicated that she no longer wanted to represent herself.

¶ 18    On September 24, 2018, the defendant's case proceeded to a bench trial. On this date, the trial of the defendant and the trial of Steele were joined, by agreement, for the limited purpose of presenting the testimony of Dr. Kutz. Dr. Kutz testified regarding the multiple injuries sustained by L.S. Dr. Kutz opined that L.S.'s injuries were the result of child abuse and not consistent with the explanations provided by the defendant. L.S.'s medical records were admitted into evidence as well. After Dr. Kutz's testimony, the trials of the defendant and Steele were severed and proceeded individually.

¶ 19    On October 15, 2018, the defendant's bench trial resumed. McElroy and Detective Haney testified regarding their individual investigations of the case. The defendant's recorded statements from April 28, 2017, and May 15, 2017, were admitted into evidence. The defendant's mother, Darla Adkins, testified that she had taken the defendant to "Byrd Watson" because L.S. had been sent home on a heart monitor. Darla further testified that she offered to transport the defendant and L.S. to doctor appointments if needed. Darla told the defendant that she could also obtain transportation using the "medical transport."[1] Darla further testified that while visiting the defendant's home, she observed the defendant and Steele smoke marijuana in the house with L.S. At another visit, Darla observed that L.S.'s head "didn't look right and his arm was twitching." The defendant told Darla that this was "normal." After this visit, Darla called DCFS. The defendant did not present any evidence. After hearing closing arguments, the trial court took the case under advisement.

¶ 20    On December 12, 2018, the trial court entered a written judgment finding the defendant guilty of aggravated battery of a child. The trial court found that there was no evidence that the defendant personally inflicted the injuries upon L.S., but that the defendant aided Steele in abusing L.S. The trial court explained that the defendant observed Steele, on numerous occasions, physically abuse L.S. in various ways that were consistent with Dr. Kutz's opinion as to the cause of L.S.'s injuries. The trial court further explained that the defendant "did nothing whatsoever" to protect L.S. and aided Steele in trying to conceal L.S.'s injuries.

---

[1]At trial, McElroy testified that the defendant could request a medical transport through the Public Aid department.

¶ 21    The defendant filed a motion to reconsider judgment alleging that the State had not established that the defendant knew or should have known about Steele's abuse of L.S. The trial court denied this motion, and the case proceeded to sentencing.

¶ 22    As evidence in aggravation, the State admitted a copy of the defendant's testimony from Steele's trial where the defendant testified inconsistent with her May 15, 2017, statement. Katlynn Jett, a case worker at Lutheran Children and Family Services, testified that she was assigned to L.S.'s case in December 2018. Jett further testified that L.S. was a normal two-year-old boy except that he was having trouble with speech. Deputy Jordan Spetter of the Jefferson County Sheriff's Office testified that he transported the defendant and Steele from the courthouse to the jail following a court appearance, and that Steele masturbated in the back of the transport vehicle. Initially the defendant denied witnessing the incident. The defendant subsequently admitted to witnessing the incident and stated that she lied to Deputy Spetter because Steele was her "man." Finally, victim impact statements from Darla and the defendant's father, Rick Adkins, were read aloud. The defendant did not present any evidence in mitigation or make a statement in allocution. After hearing arguments, the trial court sentenced the defendant to 20 years in the Illinois Department of Corrections.

¶ 23    The defendant filed a motion to reconsider sentence. The trial court denied the defendant's motion. This appeal followed.

¶ 24                              ANALYSIS

¶ 25    On appeal, the defendant raises numerous contentions concerning her counsel's representation. First, the defendant alleges that she did not receive the counsel guaranteed to her by the sixth amendment because defense counsel consented to the defendant being interviewed by law enforcement, without the benefit of counsel. Next, the defendant alleges that defense counsel

9

labored under a conflict of interest, or in the alternative provided ineffective assistance of counsel, because counsel filed a fitness motion in which he asserted that the defendant made "untrue" statements and suggested that the defendant might be lying. The defendant further alleges that counsel also disclosed privileged and confidential information in the fitness motion and during the fitness proceedings. Finally, the defendant alleges that defense counsel was ineffective for failing to obtain use immunity for her testimony at codefendant Steele's trial and for relying upon a theory of defense in closing argument that was unavailable under the law. We begin with the defendant's first contention.

¶ 26    The defendant asserts that she did not receive the counsel guaranteed to her by the sixth amendment when defense counsel consented to the defendant being interviewed by Detective Haney, without the benefit of counsel. At this interview, the defendant waived her right to counsel and made incriminating statements regarding her knowledge of the abuse Steele inflicted upon L.S. The defendant argues that due to counsel's actions, she was denied counsel at a critical stage and that counsel entirely failed to subject the prosecution's case to meaningful adversarial testing such that we may presume prejudice under the standard established in *United States v. Cronic*, 466 U.S. 648, 656-57 (1984). In the alternative, the defendant argues that she has set forth a claim of ineffective assistance of counsel under *Strickland v. Washington*, 466 U.S. 668 (1984).

¶ 27    Generally, reviewing courts apply the familiar *Strickland* test to determine whether a defendant was denied the effective assistance of counsel. *People v. Cherry*, 2016 IL 118728, ¶ 24. Under *Strickland*, a defendant must show that counsel's performance was deficient, and that the deficient performance prejudiced the defendant. *Cherry*, 2016 IL 118728, ¶ 24. The Supreme Court in *Strickland* noted, however, that there are some circumstances so likely to prejudice the defendant that prejudice will be presumed. *Cherry*, 2016 IL 118728, ¶ 25. Under *Cronic*, a

10

companion case to *Strickland*, prejudice may be presumed in the following three instances: (1) the defendant is denied counsel at a critical stage; (2) counsel entirely fails to subject the prosecution's case to meaningful adversarial testing; or (3) counsel is called upon to represent a client in circumstances under which no lawyer could prove effective assistance. *Cherry*, 2016 IL 118728, ¶ 25.

¶ 28    We need not decide whether one of the *Cronic* exceptions apply to the defendant's case, because we find that the defendant has met the requirements of *Strickland* for an ineffective assistance of counsel claim. Where, as here, the defendant did not raise a claim of ineffective assistance of counsel in the trial court, our review is *de novo*. *People v. Bates*, 2018 IL App (4th) 160255, ¶ 46.

¶ 29    Under the first prong of the *Strickland* test, the defendant must show that counsel's performance was objectively unreasonable under prevailing professional norms. *Cherry*, 2016 IL 118728, ¶ 24. The defendant must overcome the strong presumption that counsel's action or inaction was the result of sound trial strategy. *People v. Jackson*, 205 Ill. 2d 247, 259 (2001). Considering the "variety of factors that go into any determination of trial strategy," an ineffective assistance of counsel claim "must be judged on a circumstance-specific basis, viewed not in hindsight, but from the time of counsel's conduct, and with great deference accorded counsel's decisions on review." *People v. Fuller*, 205 Ill. 2d 308, 331 (2002). Defendants are entitled to reasonable, not perfect, representation. *Fuller*, 205 Ill. 2d at 331. A mistake in strategy or in judgment by defense counsel will not alone render representation incompetent. *Fuller*, 205 Ill. 2d at 331. "Counsel's strategic choices are virtually unchallengeable." *Fuller*, 205 Ill. 2d at 331. Thus, the fact that another attorney might have pursued a different strategy, or that counsel's chosen strategy was unsuccessful, does not mean that counsel was ineffective. *Fuller*, 205 Ill. 2d at 331.

11

¶ 30    Here, defense counsel was appointed to represent the defendant on May 12, 2017, a Friday.[2] The following Monday, May 15, 2017, defense counsel was contacted by the State and consented to the police interviewing the defendant. Defense counsel was not present for the defendant's interview, and there is no indication in the record that counsel met with the defendant prior to the interview. At the time defense counsel consented to the police interview of the defendant, the record does not indicate whether defense counsel had spoken with his client or received discovery. Indeed, the defendant's motion for discovery was not filed until May 19, 2017. Thus, considering the circumstances of this case, it was objectively unreasonable for defense counsel to consent to Detective Haney interviewing the defendant, without the benefit of counsel. No trial strategy can be gleaned from defense counsel's decision. A reasonable attorney under the circumstances would have either not consented to the interview or attended the interview to provide advice and counsel to his client.

¶ 31    The State argues that the defendant cannot claim defense counsel's performance was deficient because the defendant reached out to Detective Haney and agreed to waive her right to counsel before speaking with Detective Haney. The defendant's actions, however, do not affect whether or not defense counsel's performance was deficient. While the defendant may have reached out to Detective Haney and subsequently waived her right to counsel, it was defense counsel's consent which first allowed the subsequent interview with the defendant to proceed.

¶ 32    Having found that counsel's performance was deficient, we must now determine whether the defendant was prejudiced by counsel's decision. To establish prejudice, a defendant must show that there is a reasonable probability that, but for counsel's unprofessional errors, the outcome of

---

[2]Reviewing courts may take judicial notice of the days of the week as they correspond to the dates of the month. *People v. Norris*, 2018 IL App (3d) 170436, ¶ 35 n.3.

the proceedings would have been different. *Cherry*, 2016 IL 118728, ¶ 24. A reasonable probability is a probability sufficient to undermine confidence in the result of the proceedings. *People v. Edwards*, 195 Ill. 2d 142, 163 (2001). The defendant is not required to show that a different verdict was likely in the absence of counsel's deficient performance. *People v. Fletcher*, 335 Ill. App. 3d 447, 455 (2002). The prejudice prong of the *Strickland* test is not an outcome determinative test but, rather, may be satisfied if the defendant can show that counsel's deficient performance rendered the outcome of the trial unreliable or the proceeding fundamentally unfair. *People v. Manning*, 241 Ill. 2d 319, 327 (2011).

¶ 33    Here, the defendant suffered prejudice because counsel's decision to consent to the police interview of the defendant deprived the defendant of meaningful counsel as guaranteed by the sixth amendment. At the May 15, 2017, police interview, the defendant made several incriminating statements regarding her knowledge of the abuse Steele inflicted upon L.S. Counsel's deficient performance in consenting to the defendant being interviewed without the benefit of counsel rendered the outcome of the trial unreliable and fundamentally unfair. Had counsel acted competently, there is a reasonable probability that the result of the proceedings would have been different because the defendant would have had the presence and/or advice of counsel before making a statement to Detective Haney. Accordingly, a new trial is warranted.

¶ 34    Given our disposition on this claim of ineffective assistance of counsel, we need not address the defendant's remaining claims concerning counsel's representation. We note, however, that defense counsel's performance remained of concern throughout the various stages in the proceedings below. Therefore, we direct the circuit court to appoint new counsel for the defendant upon remand.

¶ 35 Finally, we must consider whether another trial would violate the double jeopardy clause. Retrial is not precluded by the double jeopardy clause when a conviction is overturned because of an error in the trial proceedings, but retrial is barred if the evidence at the first trial was insufficient to sustain the conviction. *People v. King*, 2020 IL 123926, ¶ 52. For double jeopardy purposes, all evidence submitted at the first trial, including any improperly admitted evidence, may be considered when deciding the sufficiency of the evidence. *King*, 2020 IL 123926, ¶ 52. In determining the sufficiency of the evidence, we consider whether, viewing the evidence in the light most favorable to the State, any rational trier of fact could have found the essential elements of the crime beyond a reasonable doubt. *King*, 2020 IL 123926, ¶ 52.

¶ 36 Here, the defendant has not challenged the sufficiency of the evidence on appeal, and her requested relief is the reversal of her conviction and remand for a new trial. We find that the record contains sufficient evidence from which a reasonable trier of fact could have found the defendant guilty of aggravated battery of a child via accountability beyond a reasonable doubt. Therefore, no double jeopardy violation will occur upon retrial. We emphasize, however, that this determination is not binding on remand and does not reflect our opinion on the defendant's guilt or innocence.

¶ 37 For the foregoing reasons, we vacate the defendant's conviction and sentence and remand this case to the trial court for a new trial and the appointment of new counsel for the defendant.

¶ 38 Reversed and remanded.