NOTICE
Decision filed 10/28/25. The text of this decision may be changed or corrected prior to the filing of a Petition for Rehearing or the disposition of the same.

2025 IL App (5th) 230746-U

NO. 5-23-0746

IN THE

APPELLATE COURT OF ILLINOIS

FIFTH DISTRICT

NOTICE
This order was filed under Supreme Court Rule 23 and is not precedent except in the limited circumstances allowed under Rule 23(e)(1).

_____

| THE PEOPLE OF THE STATE OF ILLINOIS, | ) | Appeal from the |
| | ) | Circuit Court of |
| Plaintiff-Appellee, | ) | Jefferson County. |
| | ) | |
| v. | ) | No. 17-CF-167 |
| | ) | |
| ABAGAIL ADKINS, | ) | Honorable |
| | ) | Jerry E. Crisel, |
| Defendant-Appellant. | ) | Judge, presiding. |

_____

JUSTICE CATES delivered the judgment of the court.
Presiding Justice McHaney and Justice Sholar concurred in the judgment.

**ORDER**

¶ 1    *Held*: The defendant was denied conflict free representation of counsel and defense counsel provided ineffective assistance of counsel.

¶ 2    A jury found the defendant, Abagail Adkins, guilty of aggravated battery of a child, and she was sentenced to 20 years in the Illinois Department of Corrections (IDOC), followed by 3 years of mandatory supervised release (MSR). On appeal, the defendant argues that she was denied her constitutional right to conflict-free representation where her attorney, Vaughn, had an actual conflict of interest because Vaughn supervised the defendant's original trial counsel, Quinn. The defendant also claims that the State violated the advocate-witness rule when the State's Attorney corroborated the recantation of trial testimony by Detective Haney and defense counsel, Quinn. The State acted as a witness to explain the circumstances of the testimony that was recanted and subsequent defense counsel, Vaughn, provided ineffective assistance for failing to object to the

1

State's commentary in support of the explanation regarding Detective Haney's change in his testimony. For the foregoing reasons, we reverse and remand for a new trial, appointment of new counsel, and appointment of a new judge.

¶ 3                                    I. BACKGROUND

¶ 4      The defendant gave birth to L.S. on December 12, 2016. L.S. was admitted to the Neonatal Intensive Care Unit (NICU) at St. Mary's Hospital in St. Louis, Missouri, for prematurity. L.S. was subsequently transferred to Cardinal Glennon Hospital in January of 2017. L.S. was discharged on cardiorespiratory monitoring on February 20, 2017, and required follow-up doctor appointments. Upon discharge from Cardinal Glennon Hospital, the defendant and co-defendant, Tyrone Steele, L.S.'s father, took L.S. to their home in Mt. Vernon, Illinois.

¶ 5      The Department of Children and Family Services (DCFS) began investigating allegations of medical neglect of L.S. in April of 2017, where L.S. had not appeared for her follow-up doctor appointments and L.S.'s heart monitor was not being used properly. An investigator for DCFS met with the defendant at her home to discuss the doctor's appointments that had been missed. A follow-up appointment was made, and the defendant took L.S. to a doctor's appointment on April 20, 2017. The neonatologist was concerned because L.S. had an enlarged head. A CT scan and ultrasound revealed that L.S. had bleeding between the skull and the brain. Further medical investigation revealed that L.S. had also suffered 14 rib fractures, a skull fracture with brain tissue injury, and intraretinal hemorrhaging. L.S. was admitted to the hospital for further care.

¶ 6      The next day, DCFS investigator Jeff McElroy and Detective Justin Haney of the Mt. Vernon Police Department[1] investigated the report of injuries to L.S. L.S. was taken into protective

---

[1]By the time of trial, Detective Haney was with the Illinois State Police. For clarity, he will be referred to as Detective Haney.

2

custody. On April 21, 2017, Detective Haney interviewed the defendant regarding the injuries to L.S. The defendant indicated the child may have rolled off of the couch.

¶ 7    The second interview of the defendant was on April 28, 2017. Detective Haney again questioned her about the cause of L.S.'s injuries. The defendant claimed that Steele admitted performing CPR on the baby and that a dog may have jumped on L.S. and caused the injuries.

¶ 8    On May 11, 2017, the defendant and Steele were charged with aggravated battery of a child (720 ILCS 5/12-3.05(b)(1) (West 2016)). The allegations against the defendant included that she was accountable for Steele's conduct of causing great bodily harm by excessively disciplining L.S. for crying.

¶ 9    Attorney Scott Quinn, the chief public defender at the time, was appointed as counsel for the defendant. After Quinn was appointed, Detective Haney conducted his third interview of the defendant without her counsel, Quinn, being present. During that interview, the defendant made certain admissions regarding the cause of the injuries to L.S. Quinn did not file a motion to suppress the defendant's interview.

¶ 10                              A. Bench Trial

¶ 11    The defendant's case proceeded to a bench trial. During the defendant's trial, Detective Haney was questioned by the State's Attorney regarding the interview with the defendant on May 15, 2017. The following testimony was provided by Detective Haney,

> "Q. After they were arrested was that the end of your involvement in this investigation?
> A. It was not. After [Defendant's] incarceration, she reached out to a correctional officer on May 15, 2017, and asked to speak with me.
> Q. Okay. You say she reached out to a correctional officer, so this was after she had been arrested?
> A. That's correct.
> Q. And tell me exactly do you remember who contacted you about that?
> A. Bonne May.
> Q. And what exactly were you told?

3

A. [Defendant] wished to speak with me.

Q. So she reached out to you?

A. Correct.

Q. What did you do after receiving that information?

A. Based on the fact that she had already been appointed a court attorney, I contacted my supervisor and we contacted the State's Attorney's office, and made contact with her public defender who advised that we did have his consent to go speak with her.

Q. Are you sure we contacted her public defender?

A. I am."

On cross-examination of Detective Haney, Quinn did not ask questions regarding whether Quinn had in fact consented to defendant giving an interview with law enforcement without her attorney being present.

¶ 12 Detective Haney's trial testimony included statements that the defendant made during her interview on May 15, 2017, that demonstrated that she was aware of Steele's handling of L.S. Specifically, the defendant stated she was aware that Steele had pushed on L.S.'s chest multiple times to stop him from crying. Steele had also "slung" L.S. on the couch for crying. The defendant had also informed Detective Haney that Steele wished that L.S. was dead in a Facebook message, and that he had battered the defendant while she was pregnant. The May 15, 2017, interview, along with the other two interviews of the defendant, were published for the jury and admitted into evidence without objection by Quinn.

¶ 13 The defendant was found guilty of aggravated battery of a child and sentenced to 20 years in the IDOC. The defendant appealed her conviction.

¶ 14                                B. First Appeal

¶ 15 On appeal, the defendant claimed that she did not receive representation guaranteed to her by the sixth amendment because defense counsel, Quinn, consented to the defendant being interviewed by law enforcement, without the benefit of counsel; defense counsel labored under a conflict of interest, or in the alternative, provided ineffective assistance of counsel by suggesting

4

that the defendant may have lied; and that defense counsel disclosed privileged and confidential information. See *People v. Adkins*, 2022 IL App (5th) 190205-U. The defendant additionally claimed that defense counsel was ineffective for failing to obtain use immunity for her testimony at the codefendant's trial, and for relying on a defense theory in closing argument that was unavailable under the law.

¶ 16    We highlight that in *Adkins*, we found that defense counsel was ineffective, and stated the following:

> "Here, defense counsel was appointed to represent the defendant on May 12, 2017, a Friday. The following Monday, May 15, 2017, defense counsel was contacted by the State and consented to the police interviewing the defendant. Defense counsel was not present for the defendant's interview, and there is no indication in the record that counsel met with the defendant prior to the interview. At the time defense counsel consented to the police interview of the defendant, the record does not indicate whether defense counsel had spoken with his client or received discovery. Indeed, the defendant's motion for discovery was not filed until May 19, 2017. Thus, considering the circumstances of this case, it was objectively unreasonable for defense counsel to consent to Detective Haney interviewing the defendant, without the benefit of counsel. No trial strategy can be gleaned from defense counsel's decision. A reasonable attorney under the circumstances would have either not consented to the interview or attended the interview to provide advice and counsel to his client." *People v. Adkins*, 2022 IL App (5th) 190205-U, ¶ 30.

Based on the ineffective assistance of counsel, the defendant's conviction and sentence were vacated and remanded to the circuit court for a new trial. We additionally directed the circuit court to appoint new counsel on remand.

¶ 17         C. Pre-trial Motions regarding the May 15, 2017, Interview

¶ 18    On remand, the circuit court appointed Matt Vaughn, the chief public defender, to represent the defendant. At that time, Quinn, the defendant's initial attorney, was an assistant public defender and he was under the employment and supervision of Vaughn.[2]

¶ 19    Vaughn filed a motion to suppress the defendant's statement made to law enforcement on May 15, 2017. The defendant argued that her statement was obtained in violation of her rights under the fifth and sixth amendments where the defendant was in custody when she made statements in response to police interrogation without her counsel being present. The defendant further argued that there was an unreasonable amount of time between when the defendant was taken into custody until she was appointed counsel, which allowed the State to exploit an opportunity to confront the defendant without counsel. The motion to suppress did not include an argument that attorney Quinn had provided ineffective assistance for allowing his client to be interviewed without counsel present, even though the case had been remanded on that issue.

¶ 20    The circuit court held a hearing on the motion to suppress the defendant's statements to law enforcement. The State called Quinn to testify first. Quinn explained that in 2017, he was the chief public defender for the county. The chief public defender's job duties included the assignment of cases to assistant public defenders, and to himself, or to outside counsel in cases with conflicts of interest. Quinn testified that before he handled the defendant's criminal case, he was familiar with the defendant as he had assigned an assistant public defender to her case on the juvenile docket where the State was seeking to place the child into foster care. Quinn had anticipated that the defendant would face criminal charges due to the nature of the juvenile case.

---

[2]At the time Quinn was originally appointed to represent the defendant, Quinn was the chief public defender.

In advance of the defendant being charged with aggravated battery of a child, Quinn had met briefly with the defendant prior to her juvenile hearing and advised the defendant against self-incrimination.

¶ 21    Quinn also testified that he had planned a vacation near the time that he was appointed to represent the defendant on the aggravated battery of a child charge. After the defendant was arrested, Quinn drafted a letter advising the defendant not to speak about the case to her cellmate, on the phone, or to police without Quinn being present. Quinn claimed that either he or his secretary had hand delivered the letter to the defendant at the jail before he left for his vacation. A copy of the letter was not presented during the hearing and was not included in the record.

¶ 22    Quinn testified that he was still on vacation when he received a phone call from Steele's attorney, who informed Quinn that the defendant had been interviewed by law enforcement. Quinn could not recall if anyone had asked for his permission to interview the defendant. He then testified that he never consented to an interview of the defendant by law enforcement, "and I especially did not consent to have her interviewed without me present."

¶ 23    During cross-examination, Vaughn asked Quinn less than 20 questions. Quinn testified that he had represented the defendant through her felony trial. Quinn agreed that during the defendant's first bench trial, the defendant's statement to law enforcement on May 15, 2017, was admitted as evidence. Quinn could not recall the details of the defendant's May 15, 2017, interview with law enforcement, and could not remember the date of the letter except to say that he had it delivered to the defendant the day he found out he had been appointed as her counsel. Quinn testified that it was not his practice to allow a client to speak to law enforcement without his presence. Quinn additionally reiterated that law enforcement had not contacted him prior to May 15, 2017, to interview the defendant.

¶ 24 Detective Haney testified at the suppression hearing that he had met with the defendant on April 20, 2017, and April 28, 2017, as a part of his investigation into the injuries suffered by L.S. During these interviews, the defendant was not in custody. On May 15, 2017. Detective Haney received a message from a correctional officer on the "in-house computer system" indicating that the defendant wished to speak to the investigator. Detective Haney told his immediate supervisor about the defendant's request, and they contacted the State Attorney's office. The defendant was interviewed by Detective Haney at the Jefferson County Justice Center on the same day that her request was received. The interview was recorded. At the beginning of the interview, Detective Haney addressed the fact that the defendant had an attorney, and the defendant consented to the interview without her attorney's presence. A copy of the interview and the waiver of the defendant's rights were admitted without objection by attorney Vaughn.

¶ 25 On cross-examination by Vaughn, Detective Haney testified that prior to interviewing the defendant, he sought legal advice from the State's Attorney's office. Detective Haney knew that an attorney had been appointed to represent the defendant before she requested to speak with him. Detective Haney did not know if conducting an interview without defense counsel's presence was appropriate even though the defendant was the one who had requested the interview. Detective Haney testified that he had consulted with Mr. Featherstun, the same State's Attorney that was questioning Detective Haney during the motion hearing, and who had represented the State during the first trial. Detective Haney received advice from Featherstun on how to proceed with the interview.

¶ 26 Detective Haney also testified during cross-examination that he had reviewed his testimony from the first trial in this case. Detective Haney understood that his trial testimony was that "we had contacted her attorney and he had given us permission to interview her." Detective Haney then

8

testified he "was mistaken" in his testimony and recanted that portion of his trial testimony. He testified that he had "never spoke with *** Quinn on that day." Detective Haney explained that he was a "young detective," and he did not know what he was thinking, but he had not spoken to Quinn. Detective Haney could not recall if someone from the State's Attorney's office had informed Detective Haney that Quinn granted Detective Haney permission to speak to the defendant. Detective Haney additionally testified that he did know that Quinn was the defendant's attorney before the defendant was interviewed on May 15, 2017. However, Detective Haney could not recall how or when he learned that information.

¶ 27    After witness testimony concluded, the defense argued that any attempt by the State to deliberately elicit incriminating information or knowingly exploit an opportunity to confront the accused without counsel present was a violation of the accused's 6th amendment right to counsel. The defense additionally argued that the seven day delay between the time the defendant had been taken into custody until she had appeared before a judge jeopardized her right to counsel. Further, the defendant did not understand that she had the right to speak to her attorney before speaking to law enforcement, and Detective Haney should have obtained a waiver from Quinn and not from the defendant.

¶ 28    The State argued that the defendant understood that she had the right to speak to her attorney before speaking to law enforcement. The video recording of the interview depicted that the defendant had chosen to speak to law enforcement without her attorney, even though Detective Haney informed her of this right. Therefore, the State claimed the defendant knowingly waived her right to have her counsel present.

¶ 29    At the end of the suppression hearing, Vaughn stated that he wished to clarify the record because his motion did not include an argument that the interview should be suppressed due to

9

Quinn's ineffective assistance of counsel while acknowledging that the case had been remanded for that reason. Vaughn claimed that he had reviewed the court file, the transcripts, and he had the opportunity to speak to the defendant and to Quinn. Vaughn determined that Quinn never gave consent for Detective Haney to speak to the defendant without an attorney and Detective Haney had testified that his prior testimony at trial was in error.

¶ 30 The State then volunteered that "the record should address the fact that the Appellate Court decision essentially reversed it, presumably, for a hearing on an issue that wasn't pled." The State then commented:

> "I'm actually the one that can fill in the gaps between the two because I tried to go talk to [Quinn], and he was not here on the date in question. So when it was said by [Detective] Haney during the trial, I knew then that it was wrong. The next question asked by me was are you sure we got his consent, something in that fashion. It was, 'are you sure,' and I remember the emphasis on 'are you sure,' and the detective doubled down on it, and because that issue had never been raised, because it had never been pled, and because I thought the record woefully insufficient to justify a reversal on that limited statement that he made, this was the first time I have ever seen an issue like this, and that factual misstatement by [Detective] Haney which could have been corrected by *** Quinn and I on that date wasn't corrected. So I apologize to the Court and counsel and all the parties that that's what brought us here."

¶ 31 After the explanation offered by the State, the circuit court responded that it was "unfortunate" for the Appellate Court to remand this case "based on something that didn't happen." The circuit court then took the matter under advisement. Subsequently, the circuit court entered a written order and found that the defendant voluntarily initiated contact with Detective Haney for an interview; Detective Haney had not contacted Quinn before the defendant's interview, even though he testified unequivocally at trial that he did so; and the defendant knowingly, intelligently, and voluntarily waived her *Miranda* rights before being interviewed by law enforcement without counsel. The circuit court denied the motion to suppress.

10

¶ 32   The State filed a motion *in limine* regarding the defendant's statement to law enforcement made on May 15, 2017, where the defendant admitted to the cause and manner of physical injuries to L.S. The State sought to admit clips of the defendant's interview. At the motion hearing, the defense argued that under the completeness doctrine that the entire interview by the defendant should be played for the jury. The State and the defense agreed that if the State played the excerpts from the interview that the defense would play the remainder of the interview. The entirety of the videos of the defendant's three interviews with Detective Haney were allowed at trial as agreed on by the parties.

¶ 33                        D. Jury Trial

¶ 34   At trial, Detective Haney's testimony included that he conducted an interview with the defendant on May 15, 2017, at the Jefferson County Justice Center, at the defendant's request. The defendant's May 15, 2017, interview with Detective Haney was published for the jury and admitted into evidence subject to the previous court ruling.

¶ 35   Tim Kutz, the director of the child protection programs at SSM Health, Cardinal Glennon Children's Hospital in St. Louis, Missouri, testified to the physical abuse that L.S. sustained. Dr. Kutz opined that the injuries had not been inflicted as the result of an accident or secondary to a medical condition.

¶ 36   Brant Summers testified that he had worked with the Jefferson County Sheriff's Department, and he intercepted a letter that the defendant had written for Steele, which she had intended to pass to another inmate. In the letter dated May 14, 2018, the defendant stated that she loved Steele, he was her soul mate, and she wanted to remain in a relationship with him. The redacted letter was admitted into evidence. The State rested after Summers' testimony concluded.

11

¶ 37    The defense raised a motion for a directed verdict and argued that the State failed to meet its burden of proof under an accountability theory. The defense claimed that there was insufficient evidence which demonstrated that the defendant had aided, abetted, or assisted Steele abuse of L.S. The State argued that the defendant's failure to act when she knew that L.S. was being abused gave rise to criminal liability. The circuit court denied the motion for a directed verdict.

¶ 38    The defendant did not testify, and no further evidence was presented. After closing arguments, the jury deliberated. The defendant was found guilty of aggravated battery to a child.

¶ 39    The defendant filed a motion for a new trial. The motion included that the circuit court erred in denying the defendant's motion to suppress the defendant's statement; the guilty verdict was not supported by sufficient evidence; the circuit court erred in granting the State's motion *in limine*; the circuit court erred in overruling a for cause challenge as to a potential juror; and the circuit court erred in overruling an objection to a jury instruction. The circuit court denied the defendant's motion for a new trial.

¶ 40    The defendant was sentenced to 20 years in the IDOC, followed by 3 years of MSR. The defendant filed a motion to reconsider the sentencing decision. The circuit court denied the motion to reconsider. This appeal followed.

¶ 41                                    II. ANALYSIS

¶ 42    On appeal, the defendant argues that she was denied her constitutional right to conflict-free counsel where her appointed counsel on remand, Vaughn, was the supervisor of Quinn, her first trial counsel. The defendant additionally argues that the State violated the advocate-witness rule by allowing the State to act as a witness to corroborate Detective Haney's recantation of his trial testimony, and defense counsel Vaughn provided ineffective assistance of counsel for failing to object to the State's recitation of events surrounding the statement taken on May 15, 2017.

12

¶ 43　When determining whether a defendant was denied effective assistance of counsel, the defendant must demonstrate that counsel's performance was deficient where it fell below an objective standard of reasonableness, and the deficient performance prejudiced the defendant. *Strickland v. Washington*, 466 U.S. 668, 687-88 (1984). The defendant must overcome the strong presumption that counsel's action or inaction was the result of sound trial strategy. *People v. Jackson*, 205 Ill. 2d 247, 259 (2001). Considering the "variety of factors that go into any determination of trial strategy," an ineffective assistance of counsel claim "must be judged on a circumstance-specific basis, viewed not in hindsight, but from the time of counsel's conduct, and with great deference accorded counsel's decisions on review." *People v. Fuller*, 205 Ill. 2d 308, 331 (2002). To establish prejudice, a defendant must show that there is a reasonable probability that, but for counsel's unprofessional errors, the outcome of the proceedings would have been different. *People v. Cherry*, 2016 IL 118728, ¶ 24.

¶ 44　Both prongs of the *Strickland* test must be satisfied by the defendant for a finding of ineffectiveness. *People v. Veach*, 2017 IL 120649, ¶ 30. Ineffective assistance of counsel claims are generally reviewed *de novo*. *People v. Gunn*, 2020 IL App (1st) 170542, ¶ 91.

¶ 45　"A criminal defendant's sixth amendment right to effective assistance of counsel includes the right to conflict-free representation." *People v. Hayes*, 2024 IL App (5th) 210368, ¶ 38. Conflict-free representation guarantees that a defendant is provided with "assistance by an attorney whose allegiance to his client is not diluted by conflicting interests or inconsistent obligations." (Internal quotation marks omitted.) *People v. Yost*, 2021 IL 126187, ¶ 36. We review whether a defense counsel labored under a conflict of interest *de novo*. *People v. Salamie*, 2023 IL App (2d) 220312, ¶ 56.

13

¶ 46    Illinois recognizes two types of conflict of interest: *per se* and actual. *People v. Yost*, 2021 IL 126187, ¶ 37. A *per se* conflict of interest is one in which "specific facts about the defense attorney's status, by themselves, create a disabling conflict." *Yost*, 2021 IL 126187, ¶ 39. A defendant is not required to establish that counsel's performance was affected by the conflict if a *per se* conflict exists. *Yost*, 2021 IL 126187, ¶ 39.

¶ 47    In deciding whether an actual conflict exists, we first determine if there is a conflict and then determine whether the conflict adversely affected defense counsel's performance. *Hayes*, 2024 IL App (5th) 210368, ¶ 43. "In actual conflict situations the accused need not prove prejudice in that the conflict contributed to the conviction, but it is necessary to establish that an actual conflict of interest adversely affected the lawyer's performance." *People v. Austin M.*, 2012 IL 111194, ¶ 82. Speculative allegations and conclusory statements are insufficient for a defendant to prove an actual conflict of interest. *Yost*, 2021 IL 126187, ¶ 38. Rather, a defendant must identify a specific deficiency in defense counsel's strategy, tactics, or decision making which is attributable to the alleged conflict. *Yost*, 2021 IL 126187, ¶ 38.

¶ 48    We determined that the defendant's counsel was ineffective in *Adkins*, 2022 IL App (5th) 190205-U, where the testimony revealed that defense counsel Quinn consented to a law enforcement interview of the defendant without his presence. We remanded this case for a new trial with new counsel. Quinn's supervisor in the public defender's office, Vaughn, was assigned to the defendant's case on remand.

¶ 49    The Illinois Supreme Court considered whether a defendant is entitled to appointment of counsel other than the public defender where the defendant challenges the effectiveness of assistance rendered by an attorney from the same public defender's office in *People v. Banks*, 121 Ill. 2d 36, 39 (1987). The office of the public defender is unlike a private firm, and the

14

disqualification of a public defender will not necessarily disqualify all of the attorneys within the office of the public defender. *Banks*, 121 Ill. 2d 36 at 41. In cases involving the public defender's office, "a case-by-case inquiry should be conducted to determine whether any circumstances peculiar to the case indicate the presence of an actual conflict of interest." *Banks*, 121 Ill. 2d at 44. We, therefore, consider whether Vaughn had an actual conflict of interest in handling this case based on his relationship with Quinn, who was Vaughn's employee at the public defender's office at the time of remand.

¶ 50    The record on appeal in *Adkins*, 2022 IL App (5th) 190205-U, included uncontested testimony by Detective Haney that he conducted an interview of the defendant with Quinn's permission and without Quinn's presence. "The law of the case doctrine bars relitigation of an issue already decided in the same case." *People v. Tenner*, 206 Ill. 2d 381, 395 (2002).

¶ 51    We note that under the Illinois Rules of Professional Conduct, if a witness offers evidence that the lawyer knows is false, the lawyer "shall take reasonable remedial measures, including, if necessary, disclosure to the tribunal." Ill. R. Pro. Conduct R. 3.3(a)(3) (eff. Jan. 1, 2010). The State did not correct testimony by Detective Haney during the defendant's initial trial even though the State's Attorney representing the State was the same person representing the State during the motion to suppress hearing. At the hearing, the State admitted to knowing that Detective Haney's testimony was in error at the time it was given during trial and did nothing to correct the error.

¶ 52    We additionally note that a lawyer shall not reveal information relating to the representation of a client, unless an exception applies. Ill. R. Pro. Conduct R. 1.6 (eff. Jan. 1, 2016). Attorney-client privilege is " 'inconsistent with the search for truth' " because it " 'prevent[s] otherwise relevant and admissible evidence from being disclosed.' " *People v. Radojcic*, 2013 IL 114197, ¶ 41 (quoting *People v. Knuckles*, 165 Ill. 2d 125, 135 (1995)). "Thus, the attorney-client

privilege constitutes a departure from the general duty to disclose and, accordingly, must be 'strictly confined within its narrowest possible limits.' " *Radojcic*, 2013 IL 114197, ¶ 41 (quoting *Waste Management, Inc. v. International Surplus Lines Insurance Co.*, 144 Ill. 2d 178, 190 (1991)). Additionally, attorney-client privilege applies to the advice of an attorney to the client as well as the communications of a client to an attorney. *In re Marriage of Granger*, 197 Ill. App. 3d 363, 374 (1990).

¶ 53    On remand of this case, Vaughn filed a motion to suppress the May 15, 2017, interview given by the defendant. Vaughn's representation of the defendant was deficient where he failed to include that Quinn, a public defender in Vaughn's office, had provided ineffective assistance of counsel by consenting to law enforcement conducting an interview while Quinn was on vacation. The testimony that Quinn had given his consent to having his client interviewed without Quinn present gave rise to the ineffective assistance of counsel claim that was the basis for remand after the first trial. Nevertheless, Vaughn did not include this contention of error in the motion to suppress. Thus, the circuit court was not presented with the argument that had been the basis for remand.

¶ 54    Vaughn claimed that his decision to exclude the ineffective assistance of counsel argument in the motion to suppress was based on his review of the case and his interviews with Quinn and the defendant. The record on the initial appeal only reflected that Quinn had provided permission to Detective Haney to interview Quinn's client without counsel present. The defendant would not have had knowledge of whether Quinn gave permission or not as the May 15, 2017, interview took place before the defendant had the opportunity to speak with Quinn about her criminal case. This is bolstered by the fact that the defendant claimed she did not know she had the right to speak with Quinn prior to being interviewed by Detective Haney. Thus, it appears that Vaughn determined

that Quinn, his subordinate employee, was not ineffective, contrary to the findings in the initial appeal. According to the record made by Vaughn, this determination occurred after a conversation with Quinn. Consequently, Vaughn did not claim Quinn was ineffective.

¶ 55    During the motion to suppress hearing, Quinn testified for the State, and he did not assert attorney-client privilege. Vaughn did not object. Vaughn then conducted a brief cross-examination of Quinn. The cross-examination of Quinn was focused on how it was Quinn's practice to prohibit his clients from speaking to law enforcement if he was not present. Quinn claimed that he or someone from the public defender's office had provided the defendant with a letter advising the defendant that she should refrain from speaking to law enforcement. Vaughn did not probe Quinn on why Quinn had not questioned Detective Haney's testimony at the first trial if Quinn had not consented to the May 15, 2017, interview or why he had not taken any steps to correct the record, if Detective Haney's testimony was not accurate at the first trial.

¶ 56    Vaughn additionally did not question Quinn on what actions he had taken, if any, after discovering that while he was on vacation his client had been interviewed by law enforcement without an attorney present. Notably, Quinn had not attempted to suppress the May 15, 2017, interview that he claims was conducted without his knowledge or permission. As the chief public defender in the same office as Quinn, Vaughn should have had access to the defendant's entire file at the public defender's office. A copy of a letter advising the defendant to refrain from speaking to law enforcement that purportedly was dropped off at the jail by Quinn or another colleague was not presented at the motion hearing. Vaughn did not attempt to preclude Quinn's testimony nor did he present evidence to corroborate Quinn's testimony that he would not have allowed the defendant to speak with law enforcement without him present.

17

¶ 57   Vaughn additionally failed to conduct a vigorous cross-examination of Detective Haney at the motion to suppress hearing after Detective Haney recanted his trial testimony. "The recantation of testimony is regarded as inherently unreliable." *People v. Steidl*, 177 Ill. 2d 239, 260 (1997). The circuit court assesses the credibility of the recantation testimony after observing the demeanor of the witness during direct and cross-examination. *People v. Morgan*, 212 Ill. 2d 148, 165 (2004).

¶ 58   During the defendant's first trial, Detective Haney testified to steps that he had taken on May 15, 2017, after receiving the notification that the defendant wished to speak to him. Detective Haney had been aware that the defendant was represented by Quinn prior to that interview. Detective Haney's trial testimony revealed that he was concerned with the fact that the defendant was represented by counsel when she requested a meeting. Detective Haney had testified that he contacted his supervisor, and they contacted the State's Attorney's office for advice on this issue. Additionally, Detective Haney had testified that they "made contact with her public defender who advised that we did have his consent to go speak with her." The State's Attorney specifically asked Detective Haney, "[a]re you sure we contacted her public defender?" This would have given Detective Haney the opportunity to immediately correct his testimony, if he had misspoken. Detective Haney, nevertheless, responded, "I am." It appears that Detective Haney believed that Quinn provided permission to interview the defendant on May 15, 2017, when he testified to this fact at the first trial.

¶ 59   During the suppression hearing, Vaughn asked Detective Haney what led him to realize that his trial testimony was in error. Detective Haney's response was that he had never spoken with Quinn, that he was a "young detective," and he did not know what he was thinking when he testified at trial. Detective Haney could not recall any details of how he learned that the defendant was represented by Quinn and testified that he did not want to "speculate as to how we found that

18

out." Detective Haney did not recall that someone from the State's Attorney's office had indicated that Quinn granted permission to speak to the defendant on May 15, 2017. Vaughn did not ask Detective Haney if he could recall if any efforts were made to contact Quinn knowing that he was representing the defendant. Vaughn did not ask sufficient follow up questions after Detective Haney recanted his testimony made during the initial trial in order to clarify the record.

¶ 60 The State's Attorney who questioned Detective Haney at trial and appeared for the motion to suppress hearing was the same State's Attorney that provided legal advice to Detective Haney on May 15, 2017, before the defendant was interviewed. During the motion to suppress hearing, the State apologized to the circuit court for not correcting Detective Haney's testimony that incorrectly alleged that Quinn had granted permission to interview the defendant without his presence. The State also interjected at the suppression hearing that on May 15, 2017, he had attempted to speak to the defendant's attorney before the interview with law enforcement, but Quinn was not available.

¶ 61 The State's Attorney was not a formal witness at the suppression hearing and his recollection of the events leading up to the defendant's May 15, 2017, interview was not subject to cross-examination. He simply stood before the circuit court and asked leave to correct the record. "A lawyer shall not act as advocate at a trial in which the lawyer is likely to be a necessary witness." Ill. R. Pro. Conduct R. 3.7(a) (eff. Jan. 1, 2010). The advocate-witness rule bars attorneys from assuming a dual role as advocate and witness in the same proceedings. *People v. Blue*, 189 Ill. 2d 99, 136 (2000). The State may not provide personal opinions regarding the veracity of a witness or vouch for a witness's credibility. *People v. Roach*, 213 Ill. App. 3d 119, 124 (1991).

¶ 62 The State bolstered Quinn's testimony and Detective Haney's recantation of his trial testimony by providing an account of what had occurred on May 15, 2017, and by apologizing to

19

the circuit court for not correcting the trial record at the time the incorrect testimony was given. By making these statements of clarification, the State acted as both a witness and an advocate, which is prohibited. Vaughn did not object to the State's commentary where the State "filled in gaps" to persuade the circuit court that the change in the motion hearing testimony was credible. The State apologized to the trial court and counsel and the parties for the error that brought the parties before the trial court. The circuit court then acknowledged that, "Well, it's clear to me that that was the basis of the Appellate Court's reversal and remand. I mean, it's unfortunate it's based on something that didn't happen." Ultimately, the motion to suppress was denied.

¶ 63    Vaughn had an actual conflict of interest where he was the chief public defender and supervisor of Quinn, the defendant's initial attorney who had been found to render ineffective assistance of counsel by this court. Vaughn's performance was adversely affected by the conflict of interest where he failed to plead in the motion to suppress that Quinn provided ineffective assistance. Furthermore, Vaughn did not thoroughly cross-examine the witnesses during the suppression hearing, especially when it was revealed that Detective Haney was going to change his testimony.

¶ 64    In this regard, we consider whether Vaughn provided ineffective assistance of counsel. In addition to failing to raise the ineffective assistance of counsel claim by Quinn, as was determined by this court on appeal, Vaughn failed to object to the State's violation of the advocate-witness rule. The State's commentary bolstered the testimony of Quinn and Detective Haney. Indeed, Vaughn participated in allowing the State's Attorney the opportunity to explain the basis for making the error in the testimony during the first trial. Vaughn's performance was not the result of sound trial strategy.

¶ 65    The record demonstrates that Vaughn's performance was prejudicial to the defendant. There is a reasonable probability that, but for Vaughn's ineffective errors, the outcome of the motion to suppress would have been different. Perhaps the circuit court would not have determined that this court made an error in granting a new trial. Furthermore, the outcome of the trial may have been different had the defendant's interview with law enforcement been suppressed. Therefore, in light of the actual conflict that occurred between Vaughn and Quinn, as well as the failure by Vaughn to object to the State's explanation of what occurred to cause the error in testimony, we remand this matter for a new trial and direct the circuit court to appoint new counsel for the defendant upon remand.

¶ 66    Because we are remanding this cause for a new trial, we must consider whether another trial would violate the double jeopardy clause. Retrial is not precluded by the double jeopardy clause when a conviction is overturned because of an error in the trial proceedings, but retrial is barred if the evidence at trial was insufficient to sustain the conviction. *People v. King*, 2020 IL 123926, ¶ 52. For double jeopardy purposes, all evidence submitted at trial, including any improperly admitted evidence, may be considered when deciding the sufficiency of the evidence. *King*, 2020 IL 123926, ¶ 52. In determining the sufficiency of the evidence, we consider whether, viewing the evidence in the light most favorable to the State, any rational trier of fact could have found the essential elements of the crime beyond a reasonable doubt. *King*, 2020 IL 123926, ¶ 52.

¶ 67    Here, the defendant has not challenged the sufficiency of the evidence on appeal, and her requested relief is the reversal of her conviction and remand for a new trial. We find that the record contains sufficient evidence from which a reasonable trier of fact could have found the defendant guilty of aggravated battery of a child via an accountability theory beyond a reasonable doubt. Therefore, no double jeopardy violation will occur upon retrial. We emphasize, however, that this

determination is not binding on remand and does not reflect our opinion on the defendant's guilt or innocence.

¶ 68   The defendant requests that on remand a special prosecutor be assigned. At the suppression hearing, the State interjected statements that it attempted to have conversations with Quinn regarding an interview with the defendant, and the State possibly advised Detective Haney that Quinn provided permission to speak to his client without his presence. As the State could be a future witness regarding these statements, replacing the prosecutor on remand would avoid further issues with the advocate-witness rule. Therefore, on remand, the Chief Judge of the Circuit shall appoint, or arrange for the appointment, of a special prosecutor in this case.

¶ 69   Lastly, we consider the defendant's request for the assignment of a new judge on remand. On September 4, 2025, the State filed a motion to cite additional authority after our supreme court issued *People v. Class*, 2025 IL 129695, which we allow.

¶ 70   *Class* held that the appellate court may *sua sponte* order judicial reassignment in subsequent postconviction proceedings in "rare circumstances" in which the record "clearly reveals bias, the probability of bias, or prejudice on the part of the trial judge." *Class*, 2025 IL 129695, ¶ 37. Circumstances for recusal for bias, the probability of bias, or prejudice includes instances where the "trial judge might be called as a material witness because he has knowledge outside of the record concerning the truth or falsity of allegations made" or "where the judge has a direct, personal, and substantial pecuniary interest in a criminal case." *Class*, 2025 IL 129695, ¶ 45.

¶ 71   Illinois Supreme Court Rule 615(b)(2) provides that we may "set aside, affirm, or modify any or all of the proceedings subsequent to or dependent upon the judgment or order from which the appeal is taken." Ill. S. Ct. R. 615(b)(2) (eff. Jan. 1, 1967). This authority includes "the

22

authority to modify the subsequent proceedings by directing that a new judge be assigned on remand." *Class*, 2025 IL 129695, ¶ 31.

¶ 72    *Class* considered that the appellate court had relied on the Illinois Supreme Court decisions in *People v. Heider*, 231 Ill. 2d 1, 25 (2008), *People v. Dameron*, 196 Ill. 2d 156, 179 (2001), and *People v. Jolly*, 2014 IL 117142, ¶ 46 (2015) for its reassignment order noting that "the *Heider* and *Dameron* courts ordered reassignment to remove any suggestion of unfairness, while the *Jolly* court remanded and ordered reassignment due to the trial court's errors in conducting a *Krankel* hearing." *Class*, 2025 IL 129695, ¶ 39. *Class* acknowledged that *Heider*, *Dameron*, and *Jolly* were direct appeals, and the Illinois Supreme Court in *Class* specifically limited its analysis to an appeal from a successive postconviction proceeding. *Class*, 2025 IL 129695, ¶ 41. The Illinois Supreme Court in *Class* additionally acknowledged that "given our finding that *Heider*, *Dameron*, and *Jolly* are inapposite, we need not address whether the appellate court correctly construed those opinions as holding that factors other than bias may support reassignment upon remand to the trial court in direct appeals, as that issue is not before us." *Class*, 2025 IL 129695, ¶ 41 n.2.

¶ 73    On this direct appeal, the defendant seeks a new trial judge on remand for the defendant's third trial. The improper actions by the State and Vaughn during the suppression hearing convinced the circuit court that our initial decision in *Adkins*, 2022 IL App (5th) 190205-U was incorrect. The circuit court's comment that our decision was "based on something that didn't happen" demonstrates the probability of bias on remand where the circuit court may continue to believe the information that was improperly presented by the State's Attorney. In order to remove any suggestion of unfairness, this case should be assigned to a new judge on remand. See *Heider*, 231 Ill. 2d at 25; *Dameron*, 196 Ill. 2d at 179. Accordingly, we are remanding this case to the chief judge of the circuit court for reassignment to a different judge for further proceedings.

¶ 74                    III. CONCLUSION

¶ 75    For the foregoing reasons, we vacate the defendant's conviction and sentence and remand for a new trial, the appointment of new counsel, and the reassignment of a new judge as directed herein.

¶ 76    Reversed and remanded.